Deana Ann LOZANO, Petitioner,

v.

Juan Antonio LOZANO, Sr., Blanca Suarez Lozano, Monica I. Lozano, Sandra Warner, Eduardo A. Lozano, Respondents.

No. 99–0121.

Supreme Court of Texas.

Argued April 5, 2000.

Decided March 8, 2001.

Reba A. Eichelberger, Paul R. Koenig, Eichelberger & Koenig, Baytown, for petitioner.

Ronald J. Restrepo, Doyle Rider Restrepo Harvin & Robbins, Ben A. Baring, Jr., DeLange Hudspeth McConnell & Tibbets, Houston, for respondents.

PER CURIAM.

We grant, in part, the motion for rehearing of Blanca, Monica and Alex Lozano, withdraw our opinion dated December 14, 2000, and substitute the following in its place.

Here, we decide whether there is legally sufficient evidence to uphold a jury verdict under Texas Family Code section 42.003, which provides a cause of action to a person with a possessory right to a child against one who aids or assists in interfering with that right.[1]

---

1. § 42.003. Aiding or Assisting Interference with Possessory Right

(a) A person who aids or assists in conduct for which a cause of action is authorized by

Deana Lozano and Juan Antonio Lozano, Jr. ("Junior") are the parents of Bianca Lozano. When Deana and Junior separated, the court awarded Deana temporary custody of Bianca and gave Junior visitation rights. During one of those visits, Junior and Bianca disappeared, and neither has since been located. Deana sued Junior's parents, Juan Antonio Lozano, Sr. and Blanca Suarez Lozano; and his siblings, Monica Lozano, Eduardo Lozano ("Alex"), and Sandra Lozano Warner (collectively the "Lozanos"), under Texas Family Code section 42.003 for allegedly aiding and assisting in Junior's interference with her possessory rights. The trial court rendered judgment on the jury verdict, awarding Deana $1,000,000 against the defendants, jointly and severally, for the interference-with-possessory-rights claim, and an additional $1.2 million in punitive damages against the various defendants individually ($300,000 against each parent, and $200,000 against each sibling). The court of appeals reversed, holding that there was no evidence to support the jury's finding regarding any of the Lozanos. 983 S.W.2d 787. We affirm in part and reverse and remand in part.

Because there is some evidence to support the jury's determination that Blanca Lozano, Monica Lozano and Alex Lozano aided or assisted Junior in taking or retaining possession of Bianca or in concealing her whereabouts, the Court reverses the judgment of the court of appeals as to these defendants and remands the cause to that court for consideration of respondents' remaining points of error. Because there is no evidence that Sandra Lozano Werner or Juan Lozano aided or assisted Junior in taking or retaining possession of Bianca, the Court affirms the court of appeals' judgment that plaintiff take nothing from these defendants.

PHILLIPS, C.J., filed a concurring and dissenting opinion in which ENOCH and HANKINSON, JJ., joined except as to Part IV(D), Monica Lozano, and Part IV(E), Alex Lozano, and in which BAKER and ABBOTT, JJ., joined except as to Part IV(A), Sandra Lozano Warner, Part IV(D), Monica Lozano, and Part IV(E), Alex Lozano.

HECHT, J., filed a concurring and dissenting opinion in which OWEN, J., joined.

BAKER, J., filed a concurring and dissenting opinion in which ABBOTT, J., joined and in which ENOCH and HANKINSON, JJ., joined except as to Sandra Lozano Warner.

O'NEILL, J., did not participate.

GONZALES, J., who participated in the original decision in this case, resigned his office on December 25, 2000, and did not participate in the motion for rehearing.

Chief Justice PHILLIPS filed a concurring and dissenting opinion in which Justice ENOCH and Justice HANKINSON joined except as to Part IV(D), Monica Lozano, and Part IV(E), Alex Lozano, and in which Justice BAKER and Justice ABBOTT joined except as to Part IV(A), Sandra Lozano Warner, Part IV(D), Monica Lozano, and Part IV(E), Alex Lozano.

I agree that there is some evidence that Junior's mother assisted him in taking,

---

this chapter is jointly and severally liable for damages.

(b) A person who was not a party to the suit in which an order was rendered providing for a possessory right is not liable unless the person at the time of the violation:

(1) had actual notice of the existence and contents of the order; or

(2) had reasonable cause to believe that the child was the subject of an order and that the person's actions were likely to violate the order.

retaining or concealing Bianca. I further agree that there is no evidence that Juan or Sandra aided or assisted Junior. I cannot agree, however, that there is any evidence that Junior's younger sister and brother, Monica and Alex, assisted Junior in taking or concealing the child. Accordingly, I join in part of the Court's decision and dissent in part.

## I. Standard of Review

Section 42.003 provides for civil liability against one who aids or assists in the interference with another person's possessory interest in a child. TEX. FAM.CODE § 42.003. Under that section, a person who aids or assists the taking, retaining, or concealing of a child in violation of another's possessory rights may be liable if (1) the person had actual notice of the existence and contents of the order providing for a possessory right or (2) had reasonable cause to believe that the child was the subject of an order and that the person's actions were likely to violate the order. *Id.; see also Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992).

Here, the liability issue was submitted to the jury with the instruction that "a defendant is liable for aiding or assisting Juan Antonio Lozano, Jr., in taking or retaining or concealing the whereabouts of Bianca Lozano only when ... [s]uch Defendant *knew that the Defendant's action would aid or assist* Juan Antonio Lozano, Jr. in violating the Court's order." (Emphasis added). Because the parties included this knowing requirement in the instruction without objection, we need not decide whether this instruction was proper and may review the sufficiency of the evidence in light of the questions and instructions as submitted. *Larson v. Cook Consultants, Inc.,* 690 S.W.2d 567, 568 (Tex. 1985). Because the Lozanos admit that they had actual knowledge of the court

order awarding Deana possession, the only issue is whether there is some evidence that the Lozanos knew their actions would aid or assist Junior in taking, retaining, or concealing Bianca in violation of the order.

In reviewing a no evidence point, we consider the evidence in a light most favorable to the verdict. *Weirich,* 833 S.W.2d at 945. If more than a scintilla of evidence exists, it is legally sufficient. *Browning-Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993). To rise above a scintilla, the evidence offered to prove a vital fact must do more than create a mere surmise or suspicion of its existence. *Kindred v. Con/ Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). In determining legal sufficiency, we consider whether the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994); *see also Kindred,* 650 S.W.2d at 63.

Deana offered no direct evidence that any of the Lozanos knowingly aided or assisted Junior in taking, retaining, or concealing Bianca. But the jury's finding may be upheld on circumstantial evidence as long as it may fairly and reasonably be inferred from the facts. *Blount v. Bordens, Inc.,* 910 S.W.2d 931, 933 (Tex.1995).

## II. The Evidence

In 1994, Junior and Deana separated, going to live with their respective parents. Divorce proceedings were subsequently commenced, with the issues surrounding custody of Bianca being especially contentious.

Under temporary custody orders, Junior picked up Bianca at Deana's parents' home on Friday evening, April 7, 1995, for weekend visitation. He took the child, then twenty months old, to his own parents' home, where Juan and Blanca testified that they visited with Junior and their

granddaughter Friday evening before they went to bed.

Junior's brother, Alex, also lived in the family home, but he testified that he never saw Junior after he picked up Bianca that weekend. Junior's younger sister, Monica, who also lived at home but worked nights, testified that she only saw Junior and Bianca on Friday evening before she left for work. Finally, Juan and Blanca testified that they did not see either Junior or their granddaughter after they went to bed on Friday night.

The elder Lozanos left the house together on Saturday morning to run errands. Before they left, Juan tried to open the door to Junior's bedroom, but it was locked. Junior and the child were not at home when the Lozanos returned early that evening, nor had they come home by the time the Lozanos retired. On Sunday morning, the elder Lozanos went to church. They testified that they assumed that Junior and Bianca were asleep in Junior's bedroom, but they did not check to see. When they returned from church, Junior and the child were definitely gone.

Their only contact with Junior after Friday occurred late Sunday afternoon, when Junior spoke briefly to Blanca by telephone. She recalled Junior saying, "Mom, we're okay and I'm not coming home," but she offered no other details. Although she had not seen him since Friday, Blanca did not ask where he and Bianca had gone, when they had left, or where they would be going.

A little after 6 p.m. Sunday evening, Deana called the Lozanos' house when Junior was late returning Bianca. Blanca, who answered the phone, told Deana that Junior was on his way to her house. When Junior had not arrived after another twenty minutes, Deana called again. This time she asked Blanca which car Junior had taken. Junior did not own a car, but

his parents let him use a family vehicle when he needed transportation. Deana also asked if Junior had taken any baby clothes when he left. Blanca said that she would check and that Deana should call back.

Meanwhile, Deana called the police. Under their internal policy, it was too soon for them to be involved so they told her to contact her attorney. In checking Junior's room, Blanca discovered that some items of clothing were indeed missing. She also discovered that there were no soiled baby clothes in the room, as would be expected after a weekend visit from such a young child.

Before 7 p.m., Deana made her third call to the Lozanos. Blanca told her that none of the family's cars were missing. According to Deana, she asked again about missing clothes, but Blanca avoided giving an answer. Blanca also did not volunteer that she had not seen Junior since Friday night or that the house showed no signs of the baby's visit. Deana testified that she called two or three more times that evening before Blanca asked her not to call anymore.

After abducting Bianca, Junior apparently went to Houston, where on Monday, April 10, he cashed a $1000 check at a Houston credit union. This check had been given to him three weeks earlier by his sister Sandra, who lived with her husband near Houston.

Following Bianca's disappearance, Deana filed a missing persons report with the Baytown police and met with the district attorney's office. On April 24, the district attorney prepared an indictment against Junior for interference with child custody. Deana also continued to seek information from the Lozanos, but after a few days they quit taking her calls, and eventually

they changed to an unlisted telephone number.

Frustrated by the Lozanos' lack of cooperation, Deana filed suit against them in May, alleging that they had aided or assisted Junior in abducting or concealing Bianca. With her original petition, Deana served interrogatories and requests for admissions. Acting pro se, the Lozanos answered the suit and responded to Deana's discovery. Each of their answers and responses was nearly identical.

Because Junior and his parents were Mexican citizens and had a large extended family in Monterrey, Deana feared that Junior had fled to Mexico. In particular, Blanca's mother lived in Monterrey in a house owned by the Lozanos. Junior had also registered Bianca at birth for Mexican citizenship. Because of this connection to Mexico, Deana asked in one interrogatory for the names and addresses of all the Lozanos' relatives and friends in that country. Instead of answering, each defendant asserted his or her Fifth Amendment privilege. Juan also asserted his Fifth Amendment privilege during his deposition, although he withdrew the assertion before the deposition ended. Juan and the other Lozanos also subsequently withdrew their assertions of privilege and provided answers to all Deana's interrogatories. Deana maintains, however, that the Lozanos purposefully delayed responding to her discovery to aid Junior in concealing Bianca.

Deana also sought information from the public to aid in locating Bianca. Thousands of posters with pictures of Junior and Bianca were posted around town. Deana testified that a lot of the posters were taken down and had to be replaced. Blanca, Monica and Alex each admitted to removing or destroying one or more of these posters.

Blanca, accompanied by Alex, took down one poster from a state automobile inspection station. Blanca allegedly stated to the station owner that she did not want her son's picture up in a public place. When the station owner objected to her removal of the poster, Blanca replied that he would not be helping Deana if he knew the truth about the "child abuse". Blanca also removed a poster from a Conoco station. Blanca and Sandra went into a doctor's office where a poster was displayed, and one or both of them asked that it be taken down. When the office manager refused, either Blanca or Sandra asked if it would change her opinion if she knew that Deana had abused the baby. Finally, Alex admitted that he removed one poster, and Monica admitted taking down one poster. In August 1995, Deana got a temporary restraining order and in September a temporary injunction, enjoining the Lozanos from removing any more posters or from harassing anyone displaying a poster on their property.

Deana also suspected that the Lozanos were providing Junior with money even after he disappeared, as Junior had always been somewhat dependent on his family for financial support. In this regard, Deana found a number of cash transactions involving Alex, Junior's younger brother, suspicious. Within five months after Junior's disappearance, Alex borrowed about $3000 in three separate transactions using his credit card. Deana also found it suspicious that Blanca cashed a check for $800 just five weeks after Junior disappeared. And finally Deana pointed to the $1000 check that Sandra had given Junior just weeks before the abduction.

On this evidence, the jury found that Juan, Blanca, Sandra, Monica and Alex Lozano had each aided or assisted Junior in taking or retaining possession of Bianca or concealing her whereabouts.

### III. The Equal Inference Rule

The court of appeals held that the circumstantial evidence was not legally sufficient to support the jury's finding that any of the Lozanos aided or assisted Junior. 938 S.W.2d 787. Relying on the equal inference rule, the court of appeals discounted the evidence supporting the jury's verdict, concluding that the circumstantial evidence gave rise to equally plausible but contrary inferences—either that the Lozanos were in some way involved in Junior's abduction of Bianca or that they had no knowledge of Junior's plans and did nothing to assist him. 983 S.W.2d at 792.

■ Deana argues that the court of appeals evaluated the legal sufficiency of the evidence under an erroneous standard, causing it to substitute its view of the evidence for the jury's. As to each piece of circumstantial evidence, the court of appeals concluded that because other reasonable inferences contrary to the jury's verdict were equally plausible, the circumstantial evidence was in legal effect no evidence. 983 S.W.2d at 790–91. I agree with Deana that this approach was erroneous.

■ The equal inference rule provides that a jury may not reasonably infer an ultimate fact from meager circumstantial evidence "which could give rise to any number of inferences, none more probable than another." *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex.1997). Thus, in cases with only slight circumstantial evidence, something else must be found in the record to corroborate the probability of the fact's existence or nonexistence.

■ In purporting to apply the rule, the court of appeals cited *Continental Coffee Products Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996), which in turn cited *Litton Industrial Products, Inc. v. Gammage*, 668 S.W.2d 319 (Tex.1984). The applicable rule was succinctly stated in *Litton* as follows: "When circumstances are consistent with either of the two facts and nothing shows that one is more probable than the other, neither fact can be inferred." *Id.* at 324.

*Litton* exemplifies the type of case in which the rule may apply. There, the Deceptive Trade Practices Act applied if, but only if, a ratchet adapter was sold after the Act's effective date. Similar adaptors had been sold both before and after this date, and nothing in the record provided a clue about the particular adaptor's date of manufacture or sale. Thus, the meager circumstantial evidence gave rise to equal inferences, not because two or more reasonable inferences could be drawn, but because there was no reasonable basis in the record for inferring either that the ratchet adaptor was or was not sold after the effective date of the DTPA.

■ Properly applied, the equal inference rule is but a species of the no evidence rule, emphasizing that when the circumstantial evidence is so slight that any plausible inference is purely a guess, it is in legal effect no evidence. But circumstantial evidence is not legally insufficient merely because more than one reasonable inference may be drawn from it. If circumstantial evidence will support more than one reasonable inference, it is for the jury to decide which is more reasonable, subject only to review by the trial court and the court of appeals to assure that such evidence is factually sufficient.

■ Circumstantial evidence often requires a fact finder to choose among opposing reasonable inferences. *See, e.g., Farley v. M M Cattle Co.*, 529 S.W.2d 751, 757 (Tex.1975). And this choice in turn may be influenced by the fact finder's

views on credibility. Thus, a jury is entitled to consider the circumstantial evidence, weigh witnesses' credibility, and make reasonable inferences from the evidence it chooses to believe. *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792, 797 (1951). If it may reasonably be inferred from the circumstantial evidence in this record that one or more of the Lozanos knowingly aided or assisted Junior in taking, retaining or concealing Bianca in violation of Deana's right of possession, then there is some evidence to support the jury's verdict against such defendant or defendants.

## IV. Reasonable Inferences

Deana argues that all the Lozanos were involved in Junior's abduction scheme and that their involvement may reasonably be inferred from their respective conduct, such as refusing to share information with Deana, providing financial assistance to Junior, delaying discovery, asserting their Fifth Amendment privileges to resist her requests for discovery, and undermining her efforts to locate Bianca by removing posters and slandering her. She urges that we consider the totality of the known circumstances in determining the legal sufficiency of the circumstantial evidence and the reasonable inferences to be drawn therefrom. *See Felker v. Petrolon, Inc.*, 929 S.W.2d 460, 464 (Tex.App.—Houston [1st Dist.] 1996, writ denied) ("In reviewing circumstantial evidence, we must look at the *totality* of the known circumstances rather than reviewing each piece of evidence in isolation.").

■ Circumstantial evidence may be used to establish any material fact, but it must transcend mere suspicion. *Browning-Ferris*, 865 S.W.2d at 928. The material fact must be reasonably inferred from the known circumstances. *Joske v. Irvine*, 91 Tex. 574, 44 S.W. 1059, 1064 (1898)(in-

ference is merely a deduction from proven facts). "By its very nature, circumstantial evidence often involves linking what may be apparently insignificant and unrelated events to establish a pattern." *Browning-Ferris*, 865 S.W.2d at 927. Thus, each piece of circumstantial evidence must be viewed not in isolation, but in light of all the known circumstances. *Brinegar v. Porterfield*, 705 S.W.2d 236, 238–39 (Tex. App.—Texarkana 1986), *aff'd*, 719 S.W.2d 558 (Tex.1986); *State Farm Fire & Cas. Ins. Co. v. Vandiver*, 970 S.W.2d 731, 736 (Tex.App.—Waco 1998, no writ). With these principles in mind, I next examine whether the evidence provides legal support for the jury's verdict against each defendant.

### A. Sandra Lozano Warner

■ Sandra gave Junior a $1000 check three weeks before the abduction. Deana asserts that Sandra's check was intended to help fund Junior's abduction plans, and Junior no doubt used the money for this purpose. At the time of the abduction, Junior did not own a car, did not have a steady job and was behind in his temporary child support payments. Junior had never been able to support himself without some assistance from his parents, and thus Deana suspected that Junior could not have successfully abducted Bianca without some financial assistance from his family.

In light of the charge submitted to the jury, I must look for some evidence that Sandra "knew" that her check "would aid or assist" Junior's abduction plans. Even in the absence of direct evidence, we could affirm the judgment if there were any circumstantial evidence of such knowledge. For example, evidence that Sandra had never before given a relative such a large gift might be some evidence that would support the verdict. But the only evidence in this record is that the check was given

and that Junior needed money to accomplish his plan. Without more, this is no probative evidence of Sandra's intent to aid or assist Junior.

Deana also urges that Sandra's conduct during discovery is some evidence that she knowingly aided Junior in abducting or concealing Bianca. Sandra, like the other members of her family, asserted the Fifth Amendment privilege rather than answer certain questions posed by Deana during discovery. Acting pro se, Sandra initially declined to give the names and addresses of relatives and friends in Mexico,[1] refused to identify any person assisting her in answering the questions,[2] and also invoked the Fifth Amendment to protect the identity of her employer.[3] Some months later, after retaining an attorney, she amended her answers to the interrogatories, withdrawing her assertions of privilege and answering Deana's questions. Deana nevertheless argues that because Sandra initially invoked the privilege, the jury could infer that she either knew where Junior and Bianca were hiding or had conspired with others to conceal their whereabouts so that to provide certain information would be incriminating.

In a civil case, a fact finder may draw reasonable inferences from a party's assertion of the privilege against self-incrimination. *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *Texas Dep't of Pub. Safety Officers Ass'n v. Denton*, 897 S.W.2d 757, 763 (Tex.1995);

TEX.R. EVID. 513(c). But the negative inferences that Deana suggests are not reasonable under the circumstances disclosed in this record. While Sandra's earlier assertion of the privilege may have influenced the jury's view of her credibility, that assertion is not enough to prove the opposite of what Sandra testified the facts to be. *United States v. Rylander*, 460 U.S. 752, 761, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983) ("claim of privilege is not a substitute for relevant evidence"); *Baxter*, 425 U.S. at 318, 96 S.Ct. 1551 (judgment based only on invocation of privilege and "without regard to the other evidence" exceeds constitutional bounds); *see also Tweeddale v. Commissioner of Internal Revenue*, 841 F.2d 643, 645 (5th Cir.1988) (taxpayer cannot use privilege to meet his burden of proof in proceeding he instituted); *Custody of Two Minors*, 396 Mass. 610, 487 N.E.2d 1358, 1363 (1986) (adverse inference "is not sufficient, by itself, to meet an opponent's burden of proof"). Sandra's assertion of the Fifth Amendment does not show her culpability either by itself or in conjunction with her giving Junior the $1000 check.

Deana also complains, however, that Sandra's assertion of the Fifth Amendment privilege and other objections to discovery aided Junior in delaying Deana's search for Bianca. Deana further submits that even after Sandra waived the Fifth Amendment and supplemented her answers to interrogatories, much of the infor-

---

1. "ANSWER: Objection as to being overly broad and burdensome to Defendant. I exercise my right under the 5th Amendment of the Constitution of the United States of America to not answer this question in that my answer might tend to incriminate me."

2. "ANSWER: I refuse to answer this question in that who does, or who does not, assist me in answering these questions is totally irrelevant to the issue of the lawsuit. I exercise my right under the 5th Amendment of the Consti-

tution of the United States of America to not answer this question in that my answer might tend to incriminate me."

3. "ANSWER: I am greatly concerned that Plaintiff will harass me at my work place; therefore, I exercise my right under the 5th Amendment of the Constitution of the United States of America to not answer this question in that my answer might tend to incriminate me."

mation she provided was incomplete or wrong. But our record does not disclose that Deana complained about incomplete discovery before trial. Had she presented this complaint to the trial court, she might have obtained the information more quickly with the court's help. Instead, Deana proceeded to trial on the proof she had. Because she failed to present any specific discovery complaint to the trial court, I would not now permit Deana to transmogrify these assertions into some evidence of a statutory violation.

Nor is there any evidence that Sandra's delay in responding fully to Deana's interrogatories in any way aided or assisted Junior in concealing Bianca. Deana shared her suspicions with the investigating authorities. The police questioned family members, kept the Lozanos' house under surveillance, subpoenaed the Lozanos' phone records, and followed up on leads in Mexico. Deana offered no evidence that the police or any other government body found anything to confirm that Junior and Bianca were living in Mexico or that Junior was in contact with relatives or friends there.

Finally, Deana argues that Sandra's intent to aid Junior may be inferred from Sandra's remarks following the abduction. Deana asserts that Sandra accused her of abusing Bianca while trying to convince two employees in a doctor's office to remove one of the posters identifying Junior and Bianca. The two employees testified that after they refused, either Sandra or Blanca asked them to reconsider because Deana had abused the child.

Although Sandra is never identified as the party making the accusation, the court of appeals deduced that Sandra, rather than Blanca, must have uttered the slanderous remark because one witness only remembered Blanca specifically mentioning her attempt to file child abuse charges

with the District Attorney. Contrary to the court of appeals, I do not believe that this is enough to affirm the jury's award of damages for slander against Sandra while reversing a similar award against Blanca. 983 S.W.2d at 792–94.

Deana concedes that neither witness specified who made the remark, but she urges us to attribute the remark to both defendants. I would not do so. This is not a case in which both parties clearly committed a wrong contributing to plaintiff's injury. *Cf. Landers v. East Tex. Salt Water Disposal Co.*, 151 Tex. 251, 248 S.W.2d 731, 734 (1952) (when individual liability cannot be apportioned with reasonable certainty between two wrongdoers each contributing to the injury, plaintiff may hold wrongdoers jointly and severally liable). Nor is it a case in which one defendant was authorized to speak on behalf of the other. *See, e.g.,* 4 J. HADLEY EDGAR, JR. & JAMES B. SALES, TEXAS TORTS AND REMEDIES § 52.06[3] (2000) (agency law binds principal for agent's slanderous communications if made in course and scope). Nor is there a finding that Blanca and Sandra conspired to defame Deana. *See, e.g., Juhl v. Airington,* 936 S.W.2d 640, 644 (Tex.1996) (quoting *Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716, 719 (Tex.1995) (" 'civil conspiracy requires specific intent' to agree 'to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.' ")). Although Deana pled civil conspiracy as a part of her claim against the Lozanos, she did not submit the elements of a conspiracy to the jury, but instead asked the jury to consider each defendant individually. In light of this submission, we may only consider the evidence which pertains to Sandra specifically.

Justice Baker assumes in his dissent, however, that Sandra was part of a Lozano family conspiracy to abduct Bianca. He

speculates that Sandra herself removed posters because other family members did. He surmises that Sandra asked the doctor's employees to remove a poster and accused Deana of child abuse when they refused because she accompanied her mother to the doctor's office, and at least one of the two made such statements. Justice Baker also infers that Sandra intended to assist Junior financially in his crime because she gave him a check that he did not cash until after the abduction. Finally, he suggests that Sandra used her Fifth Amendment privilege to aid or assist Junior in some manner.

To support his conclusion, Justice Baker seems to rely on suspicion and conjecture rather than on known facts. But suspicion and conjecture are not evidence. *Browning–Ferris*, 865 S.W.2d at 928; *Kindred*, 650 S.W.2d at 63. Legally sufficient circumstantial evidence requires a logical bridge between the proffered evidence and the necessary fact. *See Joske*, 44 S.W. at 1064 (inference is merely a deduction from proven facts). Although Justice Baker argues that there is sufficient circumstantial evidence to make this bridge, he never pieces these circumstances together to make the requisite connection, and in lieu of such analysis, he substitutes only his own suspicion. Our law, however, "does not permit the citizen to be deprived of his property, his liberty, or his life upon mere surmise or suspicion, and places upon a trained judiciary the grave responsibility of determining as a question of law whether the testimony establishes more." *Id.* at 1062. Because there is no evidence that Sandra knowingly aided or assisted Junior in the abduction or concealment of Bianca, I concur in the Court's decision to affirm the judgment of the court of appeals that plaintiff take nothing from Sandra Lozano Warner.

## B. Blanca Lozano

■ Deana argues that Blanca aided and assisted Junior in concealing Bianca by asserting her Fifth Amendment privilege, delaying discovery, taking down posters, and accusing Deana of child abuse. Deana further contends that Blanca aided Junior in the abduction by misrepresenting Junior's intentions and concealing other significant information from her.

Blanca and Juan were the last family members to see Junior and Bianca before they disappeared. Although they both maintained that Junior and Bianca slept in Junior's room Friday and Saturday night, they never actually saw either father or child after Friday evening. When Junior finally called Sunday afternoon, Blanca apparently was neither curious about where he had gone nor what he had been doing. Further, when Deana called, concerned as to why Junior was late returning Bianca, Blanca misrepresented that Junior and the child were on their way to Deana's. Although she had not seen Junior in two days and knew there were no visible signs that the child had spent any appreciable time in their home that weekend, Blanca did not provide this information to Deana in any of their several conversations Sunday evening. Far from sharing Deana's concern, Blanca soon simply quit taking her calls.

Blanca testified that she did not see Bianca after Friday and conceded that there were no signs that Junior "had fed [Bianca] or [done] anything in [the Lozanos'] house" that weekend. Blanca exhibited no apparent misgivings at not having shared more time with Bianca during visitation that weekend, testifying that it was not uncommon for Junior to take the baby away from home to the park, to the mall, and even to Galveston during visitation. In contrast to Blanca's attitude that weekend, Deana testified that Blanca was ordi-

narily so intent on spending time with her granddaughter that her visits to Bianca's daycare became disruptive and had to be curtailed.

The record further reveals that Blanca attempted to remove some of the posters seeking information about the abduction, and succeeded in doing so on at least two occasions. An employee at a Conoco station testified that Blanca removed one poster and later returned to ask that others be taken down. The owner of an automobile inspection station testified that Blanca removed a poster on his property, justifying her actions when challenged by vaguely alluding to problems of child abuse. Blanca also tried unsuccessfully to remove posters displayed at the doctor's office she visited with Sandra. As I have already discussed, the doctor's employees rebuffed this attempt.

 The police detective investigating Bianca's abduction testified to the importance of informing the public about the abduction, agreeing with Deana's attorney that destroying posters would interfere with his efforts to apprehend Junior. Blanca explained, however, that she removed these posters because they were embarrassing and harassing to her family. The court of appeals found her explanation to be equally as plausible as Deana's theory that Blanca removed the posters to inhibit the search for Bianca. 983 S.W.2d at 792. The court further concluded that Blanca's reluctance to share information with Deana was just as likely a product of animosity over Deana's divorce and custody dispute with Junior as it was her desire to aid Junior in concealing Bianca. *Id.* at 791–92. This may all be true. But as I have discussed, the mere fact that more than one reasonable inference may be drawn from this evidence does not mean that no evidence supports the jury's verdict. If more than one reasonable infer-

ence may be drawn, a question of fact is ordinarily presented for the jury to decide. *Benoit*, 239 S.W.2d at 796–97.

Considering all the circumstantial evidence, the jury could have reasonably inferred that Blanca's conduct violated the statute. They could have believed that Blanca intended to delay Deana's search and thereby aid Junior, first by misrepresenting that Junior was on his way to her house and later by refusing to provide information to Deana when she called. Blanca's apparent disinterest in her granddaughter's unexplained disappearance also supports the inference that she knew that Bianca, although not in her mother's care, was nevertheless safe with Junior. Further, the jury might have reasonably believed that Blanca's vague allusions to child abuse aided or assisted Junior by discouraging others from helping Deana find her child. These conclusions are reasonable and fair inferences drawn from the evidence and are legally sufficient to support the jury's finding that Blanca Lozano knowingly aided or assisted Junior. Because there is some evidence that Blanca aided or assisted Junior, I concur in the Court's decision to reverse the court of appeals' judgment as to her and remand to that court for a factual sufficiency review of the evidence.

C. Juan Lozano

 Juan was privy to much of the same information as Blanca during the weekend which ended in Bianca's abduction. While he claimed that he was somewhat concerned about not seeing his son or granddaughter after Friday evening, he apparently was not sufficiently concerned to take any action. Nevertheless, Juan was not involved in conversations with Deana or her requests for additional information on April 9. Nor did he remove any posters or participate in spreading rumors

of Deana's child abuse after the abduction. And while it may seem peculiar that Juan was not more active in the search for his missing son and granddaughter, he did cooperate with the authorities. Without more, no reasonable inference may be drawn from his apparent inactivity.

Deana maintains, however, that there is more. She argues that Juan's assertion of the Fifth Amendment privilege and other delay in responding to discovery is some evidence that he knowingly aided or assisted Junior. Like Sandra and the other family members, Juan initially declined to give the names and addresses of relatives and friends in Mexico. He also asserted the privilege on advice of counsel during his deposition, but months later he answered Deana's deposition questions and written interrogatories. Deana again argues that because Juan initially invoked the privilege, the jury could reasonably infer that he either knew where Junior and Bianca were hiding or had conspired with others to conceal their whereabouts so that to provide certain information would be incriminating.

I have already rejected a similar argument against Sandra. As with her, I note as to Juan that any adverse inference from using the privilege "is not sufficient, by itself, to meet an opponent's burden of proof." *Custody of Two Minors,* 487 N.E.2d at 1363.

Finally, Deana submits that Juan's lack of candor during discovery is probative of his intent to aid Junior in concealing Bianca. For example, rather than disclose his plans to visit Mexico, Juan objected that an interrogatory inquiring about plans to travel outside the country was too speculative because it did not include any time frame. Two days after filing his objection, Juan and the family left for their time-

share condominium in Cancun, Mexico.[4] In July and November, Juan also traveled to Monterrey with Blanca and Alex. Although the stated purpose of the trips to Monterrey was to visit Blanca's ailing mother, Deana suspects that all these trips were really to see Junior and Bianca.

When Deana shared her discovery and suspicions with the authorities, as previously discussed, the police found nothing to confirm that Junior and Bianca were living in Mexico or that Junior was in contact with relatives or friends there. While lack of candor during discovery may reasonably affect a jury's view of credibility, it is not a substitute for evidence. Deana's unconfirmed suspicion is not evidence that Juan aided or assisted Junior. *Browning–Ferris,* 865 S.W.2d at 927 ("some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence"). Because there is no evidence that Juan knowingly aided or assisted Junior in abducting or concealing Bianca, I believe the court of appeals correctly rendered judgment that plaintiff take nothing from Juan Lozano.

### D. Monica Lozano

Deana asserts that Monica, like the other Lozanos, aided or assisted Junior by asserting her Fifth Amendment privilege and delaying discovery. Additionally, Deana maintains that Monica aided Junior's concealment of the child by tearing down posters she had placed around town. The police detective investigating the abduction testified that these posters were an important investigative tool and that their removal would interfere with his efforts to locate the child. Monica admitted that she removed one poster at a sports bar.

---

4. Sandra Warner did not accompany the fam- ily on any trip to Mexico in 1995.

Monica explained that she removed this poster because it disclosed her home street address and was embarrassing to her. The court of appeals considered Monica's explanation, concluding that it was equally as plausible as the inference that she removed the poster to help Junior by limiting public information about his crime. But the known fact—Monica's removal of a poster—does not in my view implicate the equal inference rule. Given the purpose of these posters, it may reasonably be inferred that by removing one Monica intended to aid or assist Junior in concealing the child. An equal but opposite inference is not suggested by the bare fact of its removal. Monica's testimony may have put her intent in issue, but it did not negate the reasonable inference that she intended something else when she removed the poster.

Intent alone, however, is not enough under the statute. The Family Code premises liability on aiding or assisting the perpetrator, providing a cause of action against "(a) person who takes or retains possession of a child or who conceals the whereabouts of a child in violation of a possessory right of another person" and against "(a) person who aids or assists in (such) conduct." TEX. FAM.CODE §§ 42.002(a), 42.003(a). Thus, I must examine the record for any evidence that Monica's removal of the poster aided or assisted Junior in concealing the child from the authorities.

These posters were put up to collect information on Junior's whereabouts, and the police detective in charge of the investigation testified generally to their effectiveness in other cases. He further testified that thousands of posters were put up around town—that posters were literally "everywhere you looked...." Deana agreed with this assessment, testifying that she put up "around a thousand or more" posters herself. The detective also testified about the efforts of others to publicize the disappearance, including Crime Stoppers, Advo, Inc., the National Center for Missing and Exploited Children, as well as the local newspapers. Unfortunately, none of these efforts succeeded in locating Junior or the child.

The inquiry, however, is not about what was done to locate Junior and the child, but rather about what Monica did to hinder those efforts. The issue is whether the removal of one poster is some evidence, more than a scintilla, of aid and assistance to Junior.[5] As we have said, more than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Burroughs Wellcome Co., v. Crye*, 907 S.W.2d 497, 499 (Tex.1995). On the other hand, less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *Kindred*, 650 S.W.2d at 63. The detective testified generally to the importance of publicizing the abduc-

---

**5.** Contrary to the assertion in Justice Baker's concurring opinion, I apply only the burden imposed by the Family Code, which provides that "[a] person who aids or assists in conduct for which a cause of action is authorized by this chapter is jointly and severally liable for damages." TEX. FAM.CODE § 42.003. This is not equivalent to "successfully" aid or assist which to me would imply at least cause in fact. Under this record, I believe that it is unreasonable to infer that the removal of one

poster could have aided or assisted Junior in concealing the child. Justice Baker, on the other hand, suggests that because it is impossible to know under this record whether the removal of a single poster aided or assisted, we must leave it to the jury to guess whether or not it did. It is still erroneous to authorize a jury verdict on "mere surmise or suspicion" that a fact may exist. *Kindred*, 650 S.W.2d at 63.

tion, but he did not testify that the removal of a particular poster had any effect on his efforts to locate Junior. I have not found any additional evidence or circumstances in this record to indicate that Monica's removal of a poster aided or assisted Junior's concealment of the child. Without some logical connection between the removal of the poster from the sports bar and the authorities inability to find Junior, I believe it unreasonable to infer that Junior could have been aided or assisted by Monica's actions. Because there is no evidence that Monica knowingly aided or assisted Junior in abducting or concealing Bianca, I would affirm the court of appeals' judgment that plaintiff take nothing from Monica Lozano.

### E. Alex Lozano

Deana asserts that Alex aided or assisted Junior in concealing Bianca by asserting the Fifth Amendment, delaying discovery, removing posters and providing financial assistance. Alex admitted that he removed one poster from a Conoco station. Alex also testified that he borrowed about $3000 on his credit card within five months after Junior disappeared, a sum which totaled more than half of his earned income for that year. As with Sandra, however, Deana offers nothing beyond suspicion that this money was funneled to Junior. And as with Monica, Alex's removal of a single poster is no evidence of aid or assistance to Junior in concealing the child. Because there is no evidence that Alex knowingly aided or assisted Junior in abducting or concealing Bianca, I would affirm the court of appeals' judgment that plaintiff take nothing from Alex Lozano.

Justice Hecht, joined by Justice Owen, concurring in part and dissenting in part.

In my view, a majority of the Court in Part III of CHIEF JUSTICE PHILLIPS' OPINION misstates and misapplies settled law concerning the legal effect of circumstantial evidence. I also think that a majority of the Court in JUSTICE BAKER's opinion misconstrues section 42.003 of the Family Code to impose an unreasonable risk of liability for parental kidnapping on innocent family members. The record contains no evidence that Junior's younger sister and brother, Monica and Alex, *actually* aided him in abducting his daughter, Bianca, and therefore no basis exists for a judgment against them. I agree that there is some evidence, albeit slight, that Junior's mother assisted him, although not entirely for the reasons CHIEF JUSTICE PHILLIPS gives, and I agree with him that there is no evidence that Junior was assisted by his father or older sister. Accordingly, I concur in the Court's decision in part and dissent in part.

Under section 42.003 of the Family Code, a person who aids or assists in the taking, retention, or concealment of a child in violation of another's possessory right may be liable for any damages caused in certain circumstances.[1] By the express language of the statute, *intent* to aid or assist is not enough; a person must *actually* aid or assist. For example, a person who provides a vehicle for use in abducting a child is not liable under the statute if the vehicle is not actually used. Proof of intent to assist is necessary, at least in this case, because the trial court instructed the jury that a defendant must act knowingly, and since there was no objection to this instruction, the evidence must be measured against it as well as the statute.[2]

---

1. *Ante* at 143 n. 1.

2. *City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 71 (Tex.2000); *Larson v. Cook Consultants, Inc.,* 690 S.W.2d 567, 568 (Tex.1985).

But proof of intent is not sufficient for liability; proof of actual assistance is also necessary. Thus, for a defendant here to be liable there must be evidence that he or she knew particular conduct would aid or assist Junior and that it actually did so.

A majority of the Court, joining in JUSTICE BAKER's opinion, holds that evidence that a person has *actually* aided or assisted in violating another's possessory right to a child is unnecessary. Evidence that the defendant's actions might conceivably have aided or assisted the violation is enough to establish liability, the majority says. Their view rewrites section 42.003 to impose liability on any person whose actions might have aided or assisted in the violation of another's possessory right to a child. Thus, in the view of a majority of the Court, a person who removes one poster seeking information about a kidnapping, out of thousands of posters placed throughout the community, is some evidence for holding that person liable for aiding or assisting in the kidnapping without any evidence that the person's actions could actually have aided or assisted the kidnapper. The jury is free to find liability or not, depending largely on what they think of the defendant. As this case illustrates, the majority's view threatens to impose enormous liability on persons who were never involved in a family member's wrongful conduct.

The issue is not whether proof of aiding and assisting can be made by circumstantial evidence. As in any case, it can be. Aiding or assisting may be inferred from other facts proved. It is a rule of logic, as well as law, that when the existence of a fact does not make one possible inference more probable than another, no inference can be drawn at all. For example, one cannot infer from a photograph showing the sun on the horizon that it is either sunrise or sunset; each is a possibility—indeed, they are the only possibilities—but if nothing else is known, neither possibility is any more likely than the other. Nor can the truth be ascertained by assessing the credibility of someone looking at the photograph. The fact that he thinks the sun is setting and is a congenital liar does not make it less likely that the photograph actually shows a setting sun. The issue is not credibility but logic.

A majority of the Court in CHIEF JUSTICE PHILLIPS' opinion acknowledges this "equal inference" rule, but then in a remarkable semantical sleight, abolishes it. Quoting from the Court's opinion three years ago in *Hammerly Oaks, Inc. v. Edwards*,[3] CHIEF JUSTICE PHILLIPS' opinion states:

> The equal inference rule provides that a jury may not reasonably infer an ultimate fact from meager circumstantial evidence "which could give rise to any number of inferences, none more probable than another."[4]

His opinion then cites its 1984 opinion in *Litton Industrial Products, Inc. v. Gammage*[5] and adds:

> The applicable rule was succinctly stated in *Litton* as follows: "When circumstances are consistent with either of the two facts and nothing shows that one is more probable than the other, neither fact can be inferred."[6]

These two statements, each clear as a bell, are then turned to mush in six short sentences:

> Properly applied, the equal inference rule is but a species of the no evidence

---

**3.** 958 S.W.2d 387, 392 (Tex.1997).

**4.** *Ante* at 148.

**5.** 668 S.W.2d 319, 324 (Tex.1984).

**6.** *Ante* at 148.

rule, emphasizing that when the circumstantial evidence is so slight that any plausible inference is purely a guess, it is in legal effect no evidence. But circumstantial evidence is not legally insufficient merely because more than one reasonable inference may be drawn from it. If circumstantial evidence will support more than one reasonable inference, it is *for the jury to decide which is* more reasonable, subject only to review by the trial court and the court of appeals to assure that such evidence is factually sufficient.

Circumstantial evidence often requires a fact finder to choose among opposing reasonable inferences. And this choice in turn may be influenced by the fact finder's views on credibility. Thus, a jury is entitled to consider the circumstantial evidence, weigh witnesses' credibility, and make reasonable inferences from the evidence it chooses to believe.[7]

Most of what this passage says is true, but it is not a restatement of the "equal inference" *rule.* It is true: *that circumstantial evidence so slight that any plausible inference is purely a guess is no evidence; that circumstantial evidence is not legally insufficient merely because it supports more than one reasonable inference; that a fact finder may be required, and is entitled, to choose between competing reasonable inferences; and that this choice may require assessments of credibility.* But these propositions do not resolve the issue here, which is: if circumstantial evidence supports two reasonable inferences, neither of which is any more likely than the other, can a jury pick one? The "equal inference" rule says no. It is not enough that one inference is as reasonable as another; *to be given weight, an inference must be more probable than others.*

"Reasonable" is not the same as "probable". The "equal inference" rule stated in *Hammerly Oaks* and *Litton* (as well as other cases, noted below), expressly requires that an accepted inference not only be reasonable but that it be probable.

The passage quoted above from CHIEF JUSTICE PHILLIPS' opinion, distilled to its essence, says: " 'Properly applied,' " — which is code for "applied differently than the words appear to require"—"the equal inference rule does not really mean what it says. If more than one reasonable inference can be drawn from a fact or circumstance, and neither is more probable than the other, then a jury can pick whichever one it wants, and it may choose the inference urged by a party who is otherwise more credible." A majority of the Court cannot take its readers very seriously if it expects them to believe that a proper application of the "equal inference" rule permits the very thing the rule expressly prohibits.

Of course, as CHIEF JUSTICE PHILLIPS' opinion says, circumstantial evidence so slight that any plausible inference is purely a guess is no evidence at all. Although one cannot know from the fact that the sun is on the horizon that it is sunrise or sunset, at least those are the only two possibilities. If all one knows is that the sun is visible, or that someone *thinks* the sun is visible, even less can be inferred about the time of day. But the strength or weakness of the circumstantial evidence—the fact actually proved from which an inference, not proved, is to be drawn—is not the burden of the "equal inference" rule. Rather, the concern of that rule is with the logic of drawing inferences from evidence, however strong that evidence is. The illustration I have used,

---

7. *Ante* at 148-149 (citations omitted).

according to a majority of the Court, should be analyzed as follows:

> If circumstantial evidence—that is, the sun is on the horizon—will support more than one reasonable inference—that is, the sun is either setting or rising—it is for the jury to decide which is more reasonable, subject only to review by the trial court and the court of appeals to assure that such evidence is factually sufficient.

Evidence of the sun on the horizon may be indisputable. And it is certainly reasonable to infer from that fact that it is either rising or setting. Each possibility is equally reasonable, and equally likely, and for that reason it is impossible to tell which is true. It is silly to think that the observer's credibility will help decide. Nor do jurors have any divine powers here. Jurors are certainly entitled to consider evidence, weigh credibility, and draw inferences, but they cannot do the impossible—draw inferences when logic simply does not allow it.

There may, of course, be other evidence to indicate whether the sun is rising or setting, and the weight of that evidence may turn on its credibility. A witness may come forward to testify that the photograph was taken toward the east, or a feature of the landscape may be such that it was probably taken toward the west. A jury may disbelieve the witness and credit the other evidence, or vice versa, and find that the credible evidence makes one reasonable inference more probable than the other. But it is precisely such evidence that is missing in this case with respect to Monica and Alex. The jury could disbelieve their explanations for taking down a total of two posters and infer that they intended

to aid Junior, but there is no evidence whatever in this record that they actually *did* aid Junior. Neither the evidence that posters were taken down nor the inference that they were taken down to aid Junior makes it more likely or less likely that Junior was or was not aided.

This Court has stated and applied the "equal inference" rule correctly in at least nine cases in the past twenty-five years. CHIEF JUSTICE PHILLIPS' opinion briefly examines one of them and ignores the rest. Even a cursory review of these cases demonstrates the flaws in the majority's treatment of the present case.

In *Hammerly Oaks, Inc. v. Edwards*, one issue was whether a leasing agent was sufficiently in charge of an apartment complex to be a vice principal of the owner.[8] The circumstantial evidence offered to prove the agent's standing was that she was alone in her office when the events in question occurred. That fact, we concluded, could not support an inference that she was a vice principal because it was just as likely that she was only a secretary or receptionist.[9] We added: "A jury may not infer an ultimate fact from such evidence." [10]

In *Continental Coffee Products Co. v. Cazarez*, we held that a jury could infer retaliatory discharge from evidence that the employer's stated reason for terminating the employee was false.[11] But we also observed that the same inference of retaliatory motive could not be drawn from evidence that the employer had asked job applicants whether they had ever received compensation, or evidence that the employer doubted that the employee's injury

---

**8.** 958 S.W.2d at 392.

**9.** *Id.*

**10.** *Id.*

**11.** 937 S.W.2d 444, 452 (Tex.1996).

at issue was job-related, since the employer was legally entitled to do both.[12]

In *Blount v. Bordens, Inc.*, the issue was whether two men killed in a motor vehicle accident had a community of pecuniary interest sufficient for a joint enterprise.[13] The men were hauling two racehorses to Texas when their pickup collided with a milk truck. The father of one testified that his son had said before he left to pick up the horses that when he returned he would be able to "take care of" an insurance payment due on his car. We concluded that the father's testimony would not support an inference that his son was to be compensated, along with the other man on the trip, for hauling the horses to Texas. Rather, we said, the testimony "could give rise to any number of inferences, none more probable than another." That is, the son may well have meant nothing more by his statement to his father than that he would pay his bills when he returned. We added: "A jury may not infer an ultimate fact from such evidence."[14]

In *Transport Insurance Co. v. Faircloth*, a minor's parents were killed in a traffic accident.[15] Later the same day an adjuster met with the minor and a friend of hers to discuss settling her wrongful death claim. The adjuster also recommended attorneys that could represent the minor.[16] The minor actually retained a different attorney, one who was not experienced in wrongful death claims, and the minor's friend was appointed her guardian. The attorney was experiencing financial problems, and the guardian may have

sought to profit by his appointment, but the insurer was not aware of either of these circumstances. The claim was settled. Later, when the minor achieved the age of majority, she sued the insurer alleging that it had conspired with her guardian and her attorney to persuade her to settle her claim for less than it was worth. We concluded that the existence of a conspiracy could not be inferred from this evidence because there was no indication that the insurer knew of the attorney's and guardian's circumstances or that it was in any way connected with their actions.[17] "In short," we said, "no evidence or any inference from it makes a conspiracy conclusion more probable than not."[18]

In *Browning–Ferris, Inc. v. Reyna*, the plaintiff sued a competitor for tortiously interfering with his street-sweeping contract with the State.[19] The plaintiff offered evidence of mistreatment by the State and a comment by a State employee that the State was working with the defendant " 'to get [the plaintiff] out of the contract.' "[20] We held that the only inference that could be drawn from this evidence was that the defendant was cooperating with the State; it could not be inferred that the defendant was inducing the State to breach its contract with the plaintiff. In answer to the plaintiff's argument that the defendant's inducement could be inferred from the circumstantial evidence taken as a whole, we observed: "To the contrary, we believe that some suspicion linked to other suspicion pro-

12. *Id.*

13. 910 S.W.2d 931, 932–933 (Tex.1995) (per curiam).

14. *Id.* at 933.

15. 898 S.W.2d 269, 272 (Tex.1995).

16. *Id.* at 278–279.

17. *Id.* at 279.

18. *Id.*

19. 865 S.W.2d 925, 926 (Tex.1993).

20. *Id.*

duces only more suspicion, which is not the same as some evidence." [21]

Two forfeiture cases illustrate the necessity that one inference be more probable than others before it can follow from other facts. In *$56,700 v. State,* the State sought forfeiture of currency it claimed was derived from the sale of cocaine.[22] The money was found in a residence by undercover officers who gained entrance under a search warrant. Officers had had the residence under surveillance for over a month, but there was no indication that anything suspicious had happened. The money was found in a bank bag in a safe located in a bathroom that was in a loft area of the residence.[23] There was cocaine in the safe, although not in the bank bag, and a large amount of cocaine, some of which was pure, in the bathroom. There was cocaine, marijuana, and other drug paraphernalia in the adjacent bedroom and closet. The drug paraphernalia included a funnel, a grinder, scales, vials, and a substance commonly used to cut pure cocaine to "street quality". There was also a magazine article on laundering drug money. The homeowner, an architect, testified that he had obtained the money in his work.[24] We held that the evidence would not support an inference that the money was derived from the sale of cocaine because the inference that the homeowner was merely a purchaser and user of drugs was equally consistent. We stated, as we often have: "When circumstances are consistent with

either of two facts and nothing shows that one is more probable than the other, neither fact can be inferred." [25] We reached the opposite conclusion in *State v. $11,-014.*[26] There, a narcotics officer in an airport was watching flights known to be frequented by persons transporting drugs when he noticed a person who had deplaned and was acting suspiciously.[27] The man volunteered to the officer that he did not have a plane ticket, that he was traveling under an assumed name, and that he was a Jamaican citizen without proper immigration papers. He was then arrested by immigration authorities and searched. He had a single bag in which there were three or four items of clothing and two large bundles of cash wrapped in bedsheets .[28] He also had a bundle of cash in one of his pockets. A police dog alerted to the suitcase and separately, to the money, indicating that both smelled of marijuana. In this case, unlike *$56,700,* the inference that money was derived from the sale of drugs was more likely than an inference that only purchase and use were involved.

*Litton Industrial Products, Inc v. Gammage,*[29] the only case CHIEF JUSTICE PHILLIPS' opinion discusses,[30] is somewhat more involved than his brief summary indicates. There, the plaintiff was injured when a ratchet adapter he was using broke, and he sued the manufacturer of the device for damages, including damages under the newly enacted Deceptive Trade Practices Act.[31] One issue was whether the defen-

---

**21.** *Id.* at 927.

**22.** 730 S.W.2d 659, 660 (Tex.1987).

**23.** *Id.* at 661.

**24.** *Id.* at 662.

**25.** *Id.* .

**26.** 820 S.W.2d 783, 783–784 (Tex.1991) (per curiam).

**27.** *Id.* at 784.

**28.** *Id.* at 784–785.

**29.** 668 S.W.2d 319 (Tex.1984).

**30.** *Ante* at 148.

**31.** 668 S.W.2d at 321.

dant had manufactured or sold the ratchet adapter after the effective date of the Act.[32] The evidence was that the adapter could have been manufactured and sold to a warehouse distributor either before or after the effective date of the Act, that the adapter would then have been sold to a jobber for resale to end users like the plaintiff, that the plaintiff's employer received the adapter and charged the plaintiff for it about six months after the Act's effective date, and that the plaintiff himself was given the adapter later that year or early in 1974. From this evidence we concluded that it was no more likely that the defendant manufactured and sold the adapter after the Act's effective date than before. Contrary to what CHIEF JUSTICE PHILLIPS' opinion now says, there was a reasonable basis for concluding that the defendant sold the adapter after the Act became effective—that is, that the adapter did not end up in the plaintiff's employer's hands until six months later. But without evidence of the usual time taken for sale to an actual user, there was no way to assess whether sale after a certain date was probable or not.

Finally, in *Farley v. M M Cattle Co.*[33] we held that circumstantial evidence supported an inference that the defendant's negligence caused an accident. There, two cowboys, Farley and Beebe, were riding their horses on either side of a calf that had broken away, attempting to "lane" him back to the herd.[34] During this rapidly moving process, it happened that the two horses were suddenly headed toward each other. Beebe reined his horse sharply to the left to avoid an accident, but the two horses nevertheless collided. Beebe's horse stumbled, and Farley's horse fell,

throwing Farley to the ground. Farley was so severely injured in the incident that he was never able to give an account of what had happened. Beebe testified that if Farley had reined his horse, Crowbar, to the right, the accident would have been averted. But the evidence was that Crowbar was nervous and hardheaded, did not rein well, and often stumbled. Farley sued the ranch, alleging that its negligence in providing him with an unsuitable horse and failing to supervise the operations caused the accident. The trial court directed a verdict for the ranch, and the court of civil appeals affirmed. We reversed, holding that there was sufficient circumstantial evidence that the ranch's negligence caused the accident that the case should have gone to the jury.[35] Specifically, we explained that evidence that Farley was a good rider who knew how to get himself out of a tight situation supported an inference that he had tried to avoid the accident by reining Crowbar to the right, and evidence of Crowbar's past behavior supported an inference that he failed to respond in time to avoid the collision and fell.[36] The circumstantial evidence made the inferences probable.

Each of these cases consistently applies the "equal inference" rule. In each we insisted not only that the circumstantial evidence itself be more than slight, but that any inference to be drawn be more probable than other reasonable inferences. In this case alone a majority of the Court refuses to follow the rule.

A majority of the Court in JUSTICE BAKER's opinion concludes that Junior's younger sister, Monica, and his younger brother, Alex, may be liable because she took

**32.** *Id.* at 324.

**33.** 529 S.W.2d 751 (Tex.1975).

**34.** *Id.* at 753, 756.

**35.** *Id.* at 757.

**36.** *Id.*

down a poster at a sports bar and he took down another at a gasoline station months after Junior had disappeared. The poster Alex removed was with the permission of the station attendant. While Monica's and Alex's actions may have shown an intent to help Junior, their intent alone proves nothing. Monica and Alex may have prayed that Junior would succeed in taking Bianca from Deana, intending, hoping with all their hearts that their prayers would be answered, but that does not mean that they aided or assisted Junior without proof that God granted their prayers when He would not have helped Junior otherwise. The question is whether the evidence that Monica and Alex took down two posters supports an inference that they aided or assisted Junior. The answer is that such inference is not only improbable but virtually impossible.

The evidence is that Junior went to Houston after he abducted Bianca. Deana's theory is that he then went to Mexico, where he has family. No one suggests that he stayed in Baytown, or Harris County, or even Texas. The FBI investigated the incident and put Junior on its list of most wanted fugitives. The federal Immigration and Naturalization Service, multiple state agencies, the Harris County District Attorney's Office, and the Baytown police department all joined the search. Crime Stoppers offered a $1,000 reward for any information that might assist in locating Junior or Bianca. ADVO, Inc. and the National Center for Missing and Exploited Children, two groups who often become involved in such incidents, mailed photographs of Junior and Bianca not only into the Baytown area but throughout the nation. Local, national, and foreign media publicized the pair's disappearance. Thousands of posters soliciting information about Junior and Bianca

were put up in Baytown in virtually every public place. As the officer in charge of the investigation testified, "Everywhere you looked there were posters." In view of all this, it is simply preposterous to say, as a majority of the Court does, that taking down one poster in a gasoline station and one poster in a sports bar may have aided or assisted Junior and that Monica and Alex knew it would.

CHIEF JUSTICE PHILLIPS' opinion states: "The police detective investigating Bianca's abduction testified to the importance of informing the public about the abduction, agreeing with Deana's attorney that destroying posters would interfere with his efforts to apprehend Junior." [37] But the officer was not asked and did not testify that the removal of as few as two posters would hinder efforts to find Bianca. The issue for the Court is whether removal of two posters under the circumstances was evidence of assistance to Junior; nothing indicates that it was, including the officer's testimony. There is evidence that removing all the posters would have hindered the investigation, but there is no evidence that removing *two* posters would have had the same effect. One cannot infer from the fact that Alex would have helped Junior if he removed every poster in Baytown that he also helped him by removing just one.

JUSTICE BAKER's opinion asserts that the judgment against Monica and Alex cannot be reversed without reading into section 42.003 an additional requirement that a defendant be successful in aiding and assisting another's violation of a possessory right to a child. This simply misreads my argument. I do not say that a defendant's aid or assistance must be successful. The kidnapper may be apprehended despite the defendant's best efforts and the defendant could still be liable for aiding and

37. *Ante* at 153.

assisting. It is one thing to help another to no avail, and it is another not to help. It is one thing for a kidnapper to accept the offer of a getaway car only to be apprehended a mile down the road, and quite another thing for a kidnapper to decline the offer of the car. The person whose offer was accepted aided and assisted unsuccessfully; the person whose offer was not accepted did not aid or assist. To impose liability on Monica and Alex, section 42.003 requires that there be proof that their actions aided and assisted Junior—that is the express language of the statute—not merely that they might have. No such proof exists.

For the same reasons, the fact that Junior's mother, Blanca, took down one poster at an automobile inspection station and another at a gasoline station does not show that she aided or assisted Junior. The inspection station owner testified that the poster was down less than an hour, that he put up another in its place, and that he could not remember anyone coming by while the poster was down. The gasoline station manager stated that she told Blanca she could take down the poster if she wanted to. Nor can one infer that she assisted Junior by her occasional, general statements, made long after Junior had completely disappeared, that Deana had abused Bianca. No one so much as hints that the score of participants in the national manhunt for Junior ever heard Blanca's statements, much less that they were in the least deterred by them.

But Blanca's actions at the time of the abduction are more problematic. Blanca testified that she did not see Junior or Bianca after she went to bed Friday evening, even though there was evidence, which the jury was entitled to credit, that Blanca was ordinarily intent on spending time with her granddaughter on the weekends. Blanca testified that Junior called late Sunday afternoon to say that he and Bianca were okay and were not coming home, and that she did not inquire further. A little later, Blanca told Deana that Junior was on his way to her house when she did not know that to be true. Blanca testified that she assumed Junior and Bianca were in the home during the weekend, but after Deana called she found no dirty clothes or plates to indicate that they had been there. When Deana called Blanca back, Blanca did not disclose the lack of evidence that Junior had been in her house all weekend. There is no direct evidence that Blanca learned of Junior's departure before anyone else did, or that she knew that her actions on Saturday and Sunday would aid or assist him in leaving. However, the evidence viewed in the light most favorable to Deana does support an inference—a very, very weak inference—that Blanca assisted Junior and knew she was doing so.

I agree with CHIEF JUSTICE PHILLIPS that liability cannot be inferred from any of the other circumstantial evidence, including the defendants' interrogatory answers and objections and their assertions of privilege under the Fifth Amendment. Therefore, I would remand the case only as to Blanca to the court of appeals and would render judgment for the other four family members.

To sum up, four things besides the result are troubling about this case:

*First:* The construction of section 42.003 by a majority of the Court creates a grave danger for families in which the abduction of a child occurs. Alex's situation here is very disturbing. Months after his older brother had disappeared, and with every indication that Junior was gone for good, he took down one poster in a local gasoline station, of the thousands of posters throughout the community, and now may be liable for $1.2 million, not because he aided or assisted Junior—no one knows

whether he even could have helped at that point, regardless of how many posters he took down—but because it may be inferred that he *intended* to help Junior. As determined as the Legislature may have been to stop parental kidnapping, I cannot conceive that it intended its statute to be construed and applied as a majority of the Court has here.

*Second:* Today's decision is precedent for disregarding the "equal inference" rule. It is no more likely that Alex's removal of one poster helped Junior than that it did not. The rule has been that in such a situation no inference can be drawn from the circumstantial evidence. The Court's holding is that if it is possible that Alex's action helped Junior, and if the jury believed Deana and not Alex, then the jury could conclude that Alex's action did in fact help Junior. If we are to follow today's reasoning, the law has become that to infer a fact from circumstantial evidence, the fact need only be possible, not probable. It is therefore possible for jurors in Texas courts to do what no one else can: to infer from evidence that the sun is on the horizon that it must be sunrise.

*Third:* CHIEF JUSTICE PHILLIPS' disregard of the "equal inference" rule is particularly disturbing in light of his endorsement of the rule. The same words cannot be used to say opposite things. The rule stated by the Court in *Hammerly Oaks* and *Litton* cannot mean anything significant if it is explained and applied the way CHIEF JUSTICE PHILLIPS does here. The court of appeals had no difficulty applying the rule in this case. This Court's difficulties are inexplicable.

*Fourth:* The Court's careless nod to precedent suggests that the result in this case is more important than the process that must be employed. In case after case this Court has insisted that inferences

drawn from circumstantial evidence be sturdy enough to transcend surmise and suspicion. I do not see how the Court could explain the analyses and results in those cases consistent with its view in this one. Significantly, it does not choose to try. The only plausible explanation for today's decision, given the plain language of the statute, the clarity and logic of the "equal inference" rule, and the overwhelming precedent applying the rule in a way distinctly different from this case, is that the decision is dictated by the desired outcome. It is perhaps too strong to say that this case is result-oriented, but it is certainly ad hoc, fact-driven, and one-way. Parental kidnapping is tragic, but so is allowing a million-dollar judgment to be rendered against the culprit's family on surmise. Logic is a neutral force; it cuts both for and against. To disregard logic, as the Court has done here, is to signal that other forces have been paramount in reaching this decision. Whatever they are, they should be foreign to this realm more than they are.

\* \* \* \* \*

Law enforcement authorities suspected the Lozano family of assisting in Junior's disappearance, but in the end they found no evidence to charge, let alone convict, any of them. There is still much suspicion in this case. But as we observed in *Browning–Ferris*, "some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence ." [38]

Justice BAKER, joined by Justice ABBOTT, concurring in part and dissenting in part. Justice ENOCH and Justice HANKINSON join in Justice BAKER'S opinion except as to Sandra Lozano Warner.

I agree with the Court's decision today except for its conclusion that there is not

---

38. *Browning–Ferris,* 865 S.W.2d at 927.

legally sufficient evidence to support the verdict against Sandra Lozano Warner. Therefore, I concur with the Court's judgment except for Sandra's culpability. I also agree with Chief Justice Phillips' discussion about the equal inference rule.

## I. APPLICABLE LAW

### A. THE FAMILY CODE

Chapter 42 of the Texas Family Code allows damages for interference with a possessory interest in a child. TEX. FAM. CODE § 42.002. The Family Code also provides that a person who aids or assists in interfering with another person's possessory right is jointly and severally liable for damages. TEX. FAM.CODE § 42.003. Liability may attach if the person: (1) had actual notice of the existence and contents of the order providing for a possessory right; or (2) had reasonable cause to believe that the child was the subject of such an order and that the person's actions were likely to violate that order. TEX. FAM.CODE § 42.003(b)(1)(2); *see also Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex.1992).

### B. STANDARDS OF REVIEW

#### 1. No Evidence Review

In reviewing a no evidence claim, we must view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *Weirich*, 833 S.W.2d at 945; *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). If more than a scintilla of evidence exists, it is legally sufficient. *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex.1993). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983).

#### 2. Circumstantial Evidence

In situations where no direct evidence exists to prove a vital fact, we may uphold a jury's finding on circumstantial evidence as long as the jury could fairly and reasonably infer that finding from the facts. *Blount v. Bordens, Inc.*, 910 S.W.2d 931, 933 (Tex.1995). A jury may consider circumstantial evidence, weigh witnesses' credibility, and make reasonable inferences from the evidence it chooses to believe. *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792, 797 (1951). A party may use circumstantial evidence to establish any material fact, but that evidence must transcend mere suspicion. *Browning–Ferris, Inc.*, 865 S.W.2d at 928. The material fact must be a reasonable inference from the known circumstances. *Joske v. Irvine*, 91 Tex. 574, 44 S.W. 1059, 1063–64 (1898). Rather than view each piece of circumstantial evidence in isolation, the reviewing court must look at the totality of the known circumstances. *Barksdale v. Dobbins*, 141 S.W.2d 1035, 1038 (Tex.Civ. App.—Texarkana 1940, writ ref'd); *Felker v. Petrolon, Inc.*, 929 S.W.2d 460, 464 (Tex. App.—Houston [1st Dist.] 1996, writ denied); *Brinegar v. Porterfield*, 705 S.W.2d 236, 238–39 (Tex.App.—Texarkana), *aff'd*, 719 S.W.2d 558 (Tex.1986); *see also Long v. Long*, 133 Tex. 96, 125 S.W.2d 1034, 1036 (1939).

## II. ANALYSIS

### A. THE EVIDENCE

 I agree with Chief Justice Phillips' assessment of the evidence against Blanca and Juan, and therefore do not repeat it here. But because I disagree with his assessment of the evidence against Sandra, Monica, and Alex, I summarize below the totality of the known circumstances pertaining to these defendants.

- When the abduction occurred, Junior did not own a car, did not have a steady job, and was behind in his temporary child support payments.
- Junior had never been able to support himself without assistance from his parents.
- Sandra gave Junior a $1,000 check.
- Approximately three weeks later, on April 9, 1995, Junior abducted Bianca.
- Junior cashed Sandra's check at a Houston credit union the next day, April 10.
- Within five months after Junior's disappearance, Alex borrowed about $3,000 on his credit card, a sum totaling more than half of his earned income for that year.
- In response to Deana's discovery, Sandra, Monica, and Alex, like the other family members, asserted a Fifth Amendment privilege.
- Sandra, Monica, and Alex, like the other family members, refused to give the names and addresses of relatives and friends in Mexico on Fifth Amendment grounds.
- Sandra refused to identify any person assisting her in answering the interrogatories and refused to reveal her employer's identity on Fifth Amendment grounds.
- Thousands of posters with pictures of Junior and Bianca were posted around Baytown.
- Many posters were taken down and had to be replaced.
- Monica admitted to removing one poster.
- Alex admitted to removing one poster.

- Sandra went with Blanca to a doctor's office where a poster was displayed and asked that it be taken down.
- When the two employees in the doctor's office refused, Blanca or Sandra asked if their decision would change if they knew Deana had abused the baby.
- Sandra, Monica, and Alex, along with the other Lozanos, admitted they had actual knowledge of the court order awarding Deana possession.

### B. Sandra's, Monica's, and Alex's Liability

Deana argues that the Lozanos, including Sandra, Monica, and Alex, were involved in Junior's abduction scheme and that their involvement may reasonably be inferred from their conduct. She points to their refusing to share information with her, providing financial assistance to Junior, delaying discovery, asserting Fifth Amendment privileges to resist her requests for discovery,[1] undermining her efforts to locate Bianca by removing posters, and slandering her.

We must view the evidence in a light that tends to support the jury's finding of the disputed facts and disregard all evidence and inferences to the contrary. *See Weirich,* 833 S.W.2d at 945. We must also view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances. *Barksdale,* 141 S.W.2d at 1038; *Felker,* 929 S.W.2d at 464; *Brinegar,* 705 S.W.2d at 238–39; *see also Long,* 125 S.W.2d at 1036. Following these standards, the totality of the circumstances viewed in the light most favorable to the jury's verdict supports the jury's verdict against Sandra, Monica, and Alex.

---

1. In a civil case, the jury may draw reasonable inferences from a party's assertion of the Fifth Amendment privilege. Tex.R. Evid. 513(c); *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); ˙ *Texas Dep't Pub. Safety Officers Ass'n v. Denton,* 897 S.W.2d 757, 763 (Tex.1995).

Chief Justice Phillips concludes that the jury was unreasonable in inferring from these facts that Sandra aided or assisted Junior in abducting Bianca and that there is no "logical bridge" between these facts and the jury's finding. Despite Chief Justice Phillips' inability to see it, common sense provides the "logical bridge" between these circumstances and the jury's finding that Sandra aided or assisted Junior in abducting Bianca. Chief Justice Phillips misses the bridge because, although he states the correct standard of review, he examines each piece of evidence in isolation. *Taken together*, these facts support the jury's finding against Sandra. *See Brinegar*, 705 S.W.2d at 239 ("A single factor standing alone may be insufficient, but when joined by other factors constituting a significant whole, the combination can justify a conclusion."); *Barksdale*, 141 S.W.2d at 1038 ("All of the circumstances shown by the evidence should be considered, and even though none of the circumstances standing alone would be sufficient to show undue influence, if when considered together they produce in the ordinary mind a reasonable belief that undue influence was exerted in the procurement of a will, they are sufficient to sustain such conclusion.") (citations omitted).

██ Chief Justice Phillips dissents to the Court's conclusions about Monica and Alex on the ground that there is no evidence that Alex and Monica's actions *successfully* aided or assisted Junior. In doing so, he creates an additional and higher burden of proof that the statute does not contemplate.

In construing a statute, we ascertain legislative intent in the plain and common meaning of the words used. TEX. GOV'T CODE § 311.011; *Kroger Co. v. Keng*, 23 S.W.3d 347, 349 (Tex.2000). Thus, we cannot enlarge the unambiguous language of a statute beyond its ordinary meaning. *See*

*Montgomery I.S.D. v. Davis*, 34 S.W.3d 559, 564 (Tex.2000); *Sorokolit v. Rhodes*, 889 S.W.2d 239, 241 ("In applying the plain and common meaning of the language in a statute, courts may not by implication enlarge the meaning of any word in the statute beyond its ordinary meaning."). But Chief Justice Phillips does just that when he interprets "aid or assist" to mean *successfully* aid or assist. The plain language of the statute does not include a requirement that the aid or assistance be successful.

Further, Chief Justice Phillips' interpretation of aid or assist frustrates legislative intent. The Legislature enacted chapter 42 as part of a comprehensive attack on parental kidnapping. *See* Sampson, *Texas Family Code Symposium Supplement—Title 2. Parent and Child*, 17 TEX. TECH L.REV. 1065, 1268 (1986). Chief Justice Phillips' construction of aid and assist would weaken this attack by rendering section 42.003 useless. It would be virtually impossible for custodial parents to prove that a defendant's actions were successful in helping to take, retain, or conceal a child in violation of the parent's right to possession. For example, Chief Justice Phillips states that there is no evidence that Monica's taking down one poster had any effect on the efforts to locate Junior and Bianca. But how could anyone know whether the poster could or would have alerted someone who had seen Junior and Bianca and prompted them to call the authorities? The burden of proof the Chief Justice creates would be difficult enough in cases in which the child has been found but is impossible to meet in cases, like this, where the child remains missing.

### III. CONCLUSION

Viewing the evidence in the light most favorable to the jury's inferences and in

the light of all known circumstances, there is some evidence to support the jury's verdict against Sandra, Alex, Monica, and Blanca. *See Weirich,* 833 S.W.2d at 945. Therefore, I dissent to the Court's decision that there is no evidence to support the jury's fact finding about Sandra's culpability. I concur with the remainder of the Court's opinion.