# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00265-CV

The University of Texas at Austin, Appellant

v.

John Sampson, Appellee

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
## NO. D-1-GN-11-000915, HONORABLE GUS J. STRAUSS, JR., JUDGE PRESIDING

## D I S S E N T I N G   O P I N I O N

I respectfully dissent from the majority decision in this case because I disagree with the majority's application of the standard of review required to reverse the denial of the University's plea to the jurisdiction. Unlike the majority, I would conclude that Sampson has raised a fact issue on the question of whether the University had actual knowledge of a condition on the sidewalk that created an unreasonable risk of harm.

When, as here, the jurisdictional evidence implicates the merits, the trial court does not act as a factfinder. *University of Tex. v. Poindexter*, 306 S.W.3d 798, 807 (Tex. App.—Austin 2009, no pet.). Instead, the University's burden is very similar to that of a movant for summary judgment. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227-28 (Tex. 2004). Once the University "asserts and supports with evidence that the trial court lacks subject matter jurisdiction," we require Sampson to "show [only] that there is a disputed material fact regarding the

jurisdictional issue." *Id.* at 228. As with summary judgment, we review the trial court's legal determination in such cases de novo, taking as true all evidence favorable to the nonmovant and indulging every reasonable inference and resolving any doubts in the nonmovant plaintiff's favor. *Id.*; *Poindexter*, 306 S.W.3d at 807. Applying this standard, a review of the evidence shows that Sampson presented more than a scintilla of evidence that the University had actual knowledge of the condition on the sidewalk that presented an unreasonable risk of harm.

Sampson presented evidence that the University contracted with Austin World of Rentals (AWR) to assist with the setup for a "tailgate party." AWR employees installed lights in the trees, while the University was responsible for getting power from an electrical outlet to the area where the lights were located. There was evidence that it was standard procedure for the University to run power from outlet boxes to the areas where power was needed; therefore it could be expected that the University did so in this case as well. George Bates, the AWR contact person for this event, testified it was his understanding that "somebody from [the University]" would be running an extension cord from the power source to the area where the lights were. Bates testified that "[AWR] always duct-taped extension cords down to the ground or to the wall." The extension cord Sampson tripped over was not duct-taped to the ground. This supports an inference that the University, not AWR, ran the extension cord from the electrical outlet to the lights. University event planner Ashleigh Murray testified that the University facilities department was responsible for "turn[ing] on the electric–unlock[ing] the boxes and turn[ing] on the electrical outlets, or the power." Murray had requested that the University's electrical shop provide electrical services and requested that the University provide ten extension cords for this purpose. A cost report generated by the University's

2

electrical shop indicated that a University facilities department employee fulfilled this request. University event planner Natzyeli Leugers testified that she saw University electrical shop employees walk the site and discuss the setup for the event on either the day of or the day before the event. Leugers testified that on the day of the event she saw them "checking that we had power and that everything was fine." Leugers had reported that "every thing was double checked by a [University] Technical Crew Leader in the Electric Shop . . . before the event started." This further supports the inference that it was University employees who installed the extension cord that Sampson tripped over.

Leugers and Murray testified that they observed that the lights in the trees went out half way through the event. Upon discovering that the extension cord had become unplugged from the electrical outlet, Luegers plugged the cord back in to the outlet. Leugers testified that she "saw the cable was unplugged from the electrical cord—from the plug." The evidence was that this outage occurred around 6:00 p.m. on the day of the event; Sampson testified that he did not arrive at the law school until around 6:30 p.m.

I believe there was far more than a scintilla of evidence that University employees initially placed the cord across the walkway, that other University employees viewed the setup involving the extension cord across the sidewalk, and that still other University employees reconnected the plug when it became disconnected prior to Sampson's accident.

I am unpersuaded that the supreme court's holding in *University of Texas-Pan American v. Aguilar*, 251 S.W.3d 511 (Tex. 2008), compels the conclusion that, despite the evidence outlined above, the University did not have actual knowledge of an unreasonable risk of harm. In

*Aguilar*, the focus was on whether the University knew that a more-or-less permanent condition (the general use of water hoses on the campus) presented an unreasonable risk of harm. *Id.* at 513-14. There, the court observed that the lack of any previous incidents of students tripping on water hoses despite their prevalent use on campus supported the conclusion that there was no evidence that the University had actual knowledge "that the hose's use under these circumstances *presented an unreasonable risk of harm.*" *Id.* at 514 (emphasis added). In the present case, in contrast, there is no question that an isolated use of an electrical cord stretched across and elevated slightly above a darkened sidewalk created an unreasonable risk of harm (tripping and falling) to a pedestrian. Rather, the issue here is whether the University had *knowledge* that the cord was so positioned.

I cannot agree with the majority's conclusion that Sampson was required to "refute the University's evidence that it had not received prior reports of injuries or accidents in the relevant area." Slip op. at 15. Unlike in *Aguilar*, where the lack of reports of tripping over water hoses on campus supported a conclusion that the University had no actual knowledge that the hoses created an unreasonable risk of harm, there is no history of University employees or students successfully navigating elevated electrical cords that could even tend to show, much less conclusively prove, that the University could have been led to believe that cords positioned in that manner would not present an unreasonable risk of harm. In any event, the existence *vel non* of prior reports of injuries is merely one factor to consider in determining knowledge. Especially in a case like this one, the absence of prior reports does not conclusively negate knowledge.

Finally, the majority relies on *University of Texas at El Paso v. Muro*, 341 S.W.3d. 1 (Tex. App.—El Paso 2009, no pet.), as support for its decision. Slip op. at 12. In *Muro*, the court

held that "[w]hen circumstantial evidence presents two equally plausible, but opposite inferences, neither can be inferred." *Muro*, 341 S.W.3d at 5. The equal-inference rule, however, has no application in the present case top, side, nor bottom. *See Lozano v. Lozano*, 52 S.W.3d 141, 148-49 (Tex. 2001) (discussing equal-inference rule).

Because I believe Sampson presented more than a scintilla of evidence that the University had actual knowledge of the placement of the electrical cord he tripped over, a condition that created an unreasonable risk of harm to pedestrians using the sidewalk, I would affirm the trial court's order and therefore dissent from the majority's decision to reverse it.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Rose and Goodwin

Filed:   August 8, 2014