ACCEPTED
01-15-00676-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
12/16/2015 9:14:13 AM
CHRISTOPHER PRINE
CLERK

NO. 01-15-00676-CV

_____

IN THE COURT OF APPEALS
FOR THE FIRST JUDICIAL DISTRICT
HOUSTON DIVISION

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
12/16/2015 9:14:13 AM
CHRISTOPHER A. PRINE
Clerk

_____

AMY G. TRIANA, D/B/A IRMA K. ORTEGA,

Appellant,

v.

PHAN-TRAN PROPERTY MANAGEMENT, LLC,
MINH PHAN, MISTY TRAN, AND SERGIO CASTILLO,

Appellees.

_____

On Appeal from the 334th Judicial District Court
Of Harris County, Texas
Trial Court Cause No. 2013-74660

_____

**BRIEF OF APPELLANT, AMY G. TRIANA, B/N/F IRMA K. ORTEGA**

_____

Kurt Arbuckle
Texas Bar No. 01284500
Email: kurt@kurtarbuckle.com
Kurt Arbuckle, P.C.
2121 Sage Road, Suite 100
Houston, Texas 77056
(713) 961-5353
(713) 961-5236 Fax
Attorney for Appellant

**ORAL ARGUMENT REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

The names of all parties to this appeal and their counsel are:

| | |
|---|---|
| Appellant/Plaintiff: | Amy G. Triana, b/n/f Irma K. Ortega |
| Trial and Appellate Counsel for Appellant/Plaintiff: | Kurt Arbuckle<br>Kurt Arbuckle, P.C.<br>2121 Sage Road, Suite 100<br>Houston, Texas 77056 |
| Appellees/Defendants: | Phan-Tran Property Management, LLC, Minh Phan, and Misty Tran |
| Trial and Appellate Counsel for Appellees/Defendants: | Wolfgang A. McGavran<br>Haynes & Boone, LLP<br>1221 McKinney Street, Suite 2100<br>Houston, Texas 77010 |

# TABLE OF CONTENTS

**PAGE**

IDENTITY OF PARTIES AND COUNSEL ........................................................... i

TABLE OF CONTENTS ................................................................................ ii

INDEX OF AUTHORITIES ........................................................................... iv

STATEMENT OF THE CASE ..........................................................................1

STATEMENT REGARDING ORAL ARGUMENT ...............................................2

ISSUES PRESENTED ...................................................................................3

STATEMENT OF FACTS ...............................................................................4

SUMMARY OF THE ARGUMENT ...............................................................26

ARGUMENT ............................................................................................29

STANDARD FOR REVIEW ........................................................................29

CIRCUMSTANTIAL EVIDENCE .................................................................29

I.   DURING A PERIOD WHEN THE DEFENDANT LANDLORDS CONCEDE
     THEY WERE ON THEIR PROPERTY SO OFTEN THEY WOULD HAVE
     KNOWN IF DOGS WERE KEPT THERE, ANIMAL CONTROL WAS
     CALLED AT LEAST 12 TIMES ABOUT AGGRESSIVE PIT BULLS
     HARASSING AND BITING PEOPLE.  ANIMAL CONTROL
     DETERMINED THAT THE PIT BULLS WERE KEPT BY A TENANT ON
     THAT SAME PROPERTY.  IS THERE CIRCUMSTANTIAL EVIDENCE
     THAT THE DEFENDANTS KNEW DANGEROUS DOGS WERE BEING
     KEPT ON THEIR PROPERTY? ...............................................................30

II.  A PUBLIC NUISANCE EXISTS WHEN ACTIVITIES ON A LANDLORD'S
     PROPERTY ARE INJURIOUS TO THE SURROUNDING
     NEIGHBORHOOD.  UNDER TEXAS LAW, A LANDLORD IS
     RESPONSIBLE FOR A PUBLIC NUISANCE ON ITS PROPERTY EVEN IF
     IT IS NOT SHOWN TO HAVE ACTUAL KNOWLEDGE OF THE PUBLIC

NUISANCE, AND AN INDIVIDUAL WHO SUFFERS A UNIQUE INJURY BECAUSE OF THE PUBLIC NUISANCE HAS STANDING TO SUE. IS THERE AT LEAST A SCINTILLA OF EVIDENCE THAT DEFENDANT LANDLORDS ARE LIABLE FOR PLAINTIFF'S INJURIES RESULTING FROM A PUBLIC NUISANCE?.................................................................. 34

    A. PUBLIC NUISANCE (DOGS) AFFECTS THE COMMUNITY ..............34

    B. CONDUCT CREATING A PUBLIC NUISANCE.....................................36

CONCLUSION ..............................................................................................38

CERTIFICATE OF COMPLIANCE...........................................................38

CERTIFICATE OF SERVICE .....................................................................39

APPENDIX ...................................................................................................40

# INDEX OF AUTHORITIES

**Cases**

Allen v. Albin, et al, 97 S.W.3d 655 (Tex. App. – Waco 2002) ...........................32

Batra v. Clark, 110 S.W.3d 126, 130 (Tex. App. – Houston [1st Dist.] 2003, no writ).................................................................................................. 26, 30

Blount v. Bordens Inc., 910 S.W.2d 931, 933 (Tex. 1995 per curiam)...................29

City of Garland v. White, 368 S.W.2d 12, 16 (Tex. Civ. App. – Eastland 1963), writ refused NRE ...............................................................................37

Dodd v. State, 193 S.W.2d 569, 572 (Tex. Civ. App. – Texas – Dallas 1946).......37

Gross vs. Houston Cmty. Newspapers, 252 S.W.3d 652, 654-655 (Tex. App. – Houston [14th Dist.] 2008, no pet.)........................................................29

Jamail v. Stoneledge Condominium Owners Association, 970 S.W.2d 673, 676 (Tex. App. – Austin 1998, no pet.) ................................................. 34, 36

Lozano v. Lozano, 52 S.W.3d 141, 148 (Tex. 2001) ..............................................29

Marsan v. French, 61 Tex. 173 (1884) ...................................................................37

Merrill-Dow Pharmaceuticals, Inc. vs. Havner, 953 S.W.2d 706, 711 (Tex. 1997), cert. denied, 523 U.S. 1119, 118 S. Ct. 1799, 140 L.Ed.2d 939 (1998)........ 29, 33

Moore v. State, 107 Tex. 490, 181 S.W. 438, 439 (1915).......................................37

Quanah Acme & P. Ry. Co. v. Swearingen, 45 S.W.2d 136, 139 (Tex. Civ. App. – Amarillo 1927, writ ref'd) .............................................................36

Soap Corp. of Am. v. Balis, 223 S.W.2d 957, 960 (Tex. Civ. App. – Fort Worth 1949), writ refused NRE..............................................................36

State v. Rabinowitz, 85 Kan. 841, 118 P. 1040, 1042, 39 L.R.A., N.S., 187..........35

Stoughton v. City of Fort Worth, 277 S.W.2d 150, 153 (Tex. Civ. App. – Fort Worth 1955, no writ) ...................................................................................35

Walker v. Texas Electric Service Co., 499 S.W.2d 20, 27 (Tex. Civ. App. – Fort Worth 1973, no writ) ...................................................................................34

**Statutes**

Restatement (Second) Torts § 821B cmt. e (1979)....................................................35

## STATEMENT OF THE CASE

This is a personal injury case arising out of a dog attack by two pit bulls on a 12-year-old child. The case was filed on December 13, 2013, Cause No. 2013-74660 in the 334th Judicial District Court of Harris County, Texas, and presided over by the Honorable Grant Dorfman. The Defendants filed a No-Evidence Motion for Summary Judgment which the Court granted on July 9, 2015 (Appendix, Tab 1). A Notice of Appeal was filed on July 31, 2015.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested. Oral argument would aid the Court's decision-making process by allowing the Court to test the arguments of the parties with immediate feedback.

# ISSUES PRESENTED

I.      During a period when the Defendant Landlords concede they were on their property so often they would have known if dogs were kept there, animal control was called at least 12 times about aggressive pit bulls harassing and biting people. Animal control determined that the pit bulls were kept by a tenant on that same property. Is there circumstantial evidence that the Defendants knew dangerous dogs were being kept on their property?

II.     A public nuisance exists when activities on a landlord's property are injurious to the surrounding neighborhood. Under Texas law, a landlord is responsible for a public nuisance on its property even if it is not shown to have actual knowledge of the public nuisance, and an individual who suffers a unique injury because of the public nuisance has standing to sue. Is there at least a scintilla of evidence that Defendant Landlords are liable for Plaintiff's injuries resulting from a public nuisance?

## STATEMENT OF FACTS

1.      Minh Phan, Misty Tran, and Phan-Tran Property Management, LLC

("Owners") owned 10 commercial properties and 6-8 rent houses in October 2012.

(CR 492, Gonzalez, 7:3-11)[1]

2.      The Owners bought 2903 Red Bluff  4-5 years ago. (CR 561, Tran, 8:7-21)


**Timeline of events begins on next page**

---

[1] The following depositions are identified in this brief and were included as summary judgment evidence (references to those depositions are to CR (Clerk's Record) and page:line numbers): The deposition of Benilde Gonzalez, the property manager of the Owners (Gonzalez, page:line); The deposition of Minh Phan, one of the Owners (Phan, page:line); The deposition of Misty Tran, one of the Owners (Tran, page:line); The deposition, including its Exhibit "1," of Officer Chris Sublett, the animal control officer ( Sublett, page:line); and The deposition of Amy Triana, the minor who was attacked by the dogs (Triana, page:line).



In September of 2012, the Defendants were in the middle of a six month renovation project (CR 498, Gonzalez 13:10-13:12). Both Defendants and their property manager went to the 2903 Red Bluff location "all the time" to oversee the work (CR 566, Tran 13:6-13:10). Misty Tran went two or three times per week (CR 566, Tran 13:17-13:19). Minh Phan was out there more than that (CR 567, Tran 14:9-14:12). Their property manager also went out more often than Tran and after work (CR 567, Tran 14:13-14:18). *Tran concedes they were out there so often, that if dogs were being kept at 2903 Red Bluff, the Defendants and their property manager must know it* (CR 568, Tran 15:8-15:12).



September 11, 2012, animal control was called about complaints of two aggressive pit bulls roaming the area. (CR 617-619, Sublett, Exhibit 1, "Bates" No. 00112-00114).



September 12, 2012, a dog bite involving two pit bulls was reported to animal control. (CR 620-622, Sublett, Exhibit 1, "Bates" No. 00115-00117).



September 14, 2012, dogs reported to animal control. (CR 623-625, Sublett, Exhibit 1, "Bates" No. 00118-00120).



September 16, 2012, dogs reported to animal control. (CR 627-629, Sublett, Exhibit 1, "Bates" No. 00122-00124).



September 18, 2012, dogs reported to animal control.  (CR 630-632, Sublett, Exhibit 1, "Bates" No. 00125-00127).



September 21, 2012, very aggressive dogs reported. (CR 633-635, Sublett, Exhibit 1, "Bates" No. 00128-00130).

11



September 24, 2012, animal control dispatched to area. (CR 636-638, Sublett, Exhibit 1, "Bates" No. 00131-00133).



In September and October of 2012, the Defendants were in the middle of a six month renovation project (CR 498, Gonzalez 13:10-13:12). Both Defendants and their property manager went to the 2903 Red Bluff location "all the time" to oversee the work (CR 566, Tran 13:6-13:10). Misty Tran went two or three times per week (CR 566, Tran 13:17-13:19). Minh Phan was out there more than that (CR 567, Tran 14:9-14:12). Their property manager also went out more often than Tran and after work (CR 567, Tran 14:13-14:18). ***Tran concedes they were out there so often, that if dogs were being kept at 2903 Red Bluff, the Defendants and their property manager must know it*** (CR 568, Tran 15:8-15:12).

13



October 5, 2012, Minh Phan and Misty Tran require Sergio Castillo to sign a lease. The lease says he is not allowed dogs. (CR 492, Gonzalez 7:15-7:24).



In October of 2012, the Defendants were in the middle of a six month renovation project (CR 498, Gonzalez 13:10-13:12). Both Defendants and their property manager went to the 2903 Red Bluff location "all the time" to oversee the work (CR 566, Tran 13:6-13:10). Misty Tran went two or three times per week (CR 566, Tran 13:17-13:19). Minh Phan was out there more than that (CR 567, Tran 14:9-14:12). Their property manager also went out more often than Tran and after work (CR 567, Tran 14:13-14:18). ***Tran concedes they were out there so often, that if dogs were being kept at 2903 Red Bluff, the Defendants and their property manager must know it*** (CR 568, Tran 15:8-15:12).



October 12, 2012, aggressive dogs reported to animal control. (CR 639-641, Sublett, Exhibit 1, "Bates" No. 00134-00136).



October 16, 2012, animal control set traps to try and catch dogs. (CR 642-644, Sublett, Exhibit 1, "Bates" No. 00137-00139).



October 18, 2012, animal control determined the pit bulls were staying at 2903 Red Bluff and identified the owner as Sergio Castillo. (CR 645-654, Sublett, Exhibit 1, "Bates" No. 00140-00149).



October 19, 2012, dogs are out running again.  (CR 655-658, Sublett, Exhibit 1, "Bates" No. 00150-00153).



October 23, 2012, dogs are chasing people on bikes. (CR 659-662, Sublett, Exhibit 1, "Bates" No. 00154-00157).



October 30, 2012, Amy Triana is attacked by the pit bulls as she passes by 2903 Red Bluff.  (CR 663-670, Sublett, Exhibit 1, "Bates" No. 00158-00165).

**Details resume on next page**

3.     In the September through October 2012 timeframe, the Owners and their property manager were at or near 2903 Red Bluff constantly to oversee renovations.  (CR 530-531, Phan, 19:14 -20:15; CR 565-568, Tran, 12:10-15:24; CR 496-497, Gonzalez, 11:18-12:8)

4.     The property manager, Benilde ("Beni") Gonzalez also went to the property twice a month as a normal practice.  (CR 499, Gonzalez, 14:7-24)

5.     Owners were out at 2903 Red Bluff so often that owner, Misty Tran, agrees: if dogs were kept by a tenant at 2903 Red Bluff, the Owners must know that.  (CR 568, Tran, 15:8-24)  She also agrees that a prudent landlord would have not allowed the two pit bulls to stay on the property. (CR 568, Tran, 15:13-24)

6.     Sergio Castillo was a tenant at 2903 Red Bluff.  The Owners inherited him from the prior owner when they bought 2903 Red Bluff.  (CR 569, Tran, 16:6-9)

7.     From at least September 11, 2012, and up through the attack on Amy Triana on October 30, 2012, two pit bull terriers terrorized the community around 2903 Red Bluff.  (CR 586-588, Exhibit "1" to Sublett; the admissibility of Exhibit "1" under 803(8)(A), (B), and (C), Texas Rules of Evidence,  is established by Sublett, 4:20-6:23)

22

8.    Between September 11, 2012 and October 30, 2012, animal control dispatched officers to the area on 12 dates: September 12, 14, 17, 19, 21, and 24, and October 12, 16, 18, 19, 23, and 30. (CR 614-690, Sublett Exhibit "1")

9.    The first person harassed by the dogs identified them as coming from 2903 Red Bluff.  (CR 590-591, Sublett, 8:16-9:22)

10.    Because the dogs were getting out and running around, animal control was setting traps to catch them.  (CR 589-590, Sublett, 7:23-8:1)

11.    On October 18, 2012, one dog got caught in a trap, but got loose.  It was identified as being from 2903 Red Bluff.  (CR 589-590, Sublett, 7:23-8:15)

12.    Officer Sublett went to 2903 Red Bluff and talked to a tenant.  (the tenant would be Leonel Garcia.)  (CR 592, Sublett, 10:1-15)

13.    Leonel Garcia identified Sergio Castillo as the owner of the dogs, pointing out Castillo to the officer as Castillo drove by.  (CR 592, Sublett, 10:1-23)

14.    Officer Sublett talked to Castillo and identified him by his driver's license.  (CR 592-593, Sublett, 10:24-11:7)

15.    Castillo admitted they were his dogs.  A note in the officer's report reads, "[Castillo's] dogs were the ones that have been running loose on Long Wood for over a month now and have bitten people and killed a cat too."   (CR 593, Sublett, 11:11-14 and CR 645, Sublett Exhibit "1", Bates No. 00140)

23

16.     Castillo was issued six citations.  (CR 645, Sublett Exhibit "1," Bates No. 00140)

17.     Castillo was cautioned to find out how the dogs were getting out or he would continue to get citations.  (CR 645, Sublett Exhibit "1," Bates No. 00140)

18.     After that, Officers were again dispatched on October 19th and 23rd, 2012 to deal with the dogs.  (CR 615-690, Sublett Exhibit "1")

19.     All this happened over a time during which owner, Misty Tran, admits the Owners must know the dogs were there.  (CR 568, Tran, 15:8-24)

20.     On October 30, 2012, the dogs came out of the fence at 2903 Red Bluff and confronted twelve-year-old Amy Triana walking past 2903 Red Bluff on her way to middle school.  (CR 745-748, Triana, 54:19-57:17)

21.     The dogs pursued Amy Triana as she tried to get away by crossing the street to get to a fire station.  (CR 748, Triana, 57:18-21)

22.     The dogs knocked Amy Triana to the ground and attacked her legs and buttocks; bites severe enough to require surgery later.  (CR 750, Triana, 59:8-16)

23.     One of the dogs went for the girl's throat.  (CR 751, Triana, 60:5-9)

24.     In a panic, she struck the dog and the two dogs ran off.  (CR 751, Triana, 60:5-9)

25. Sergio Castillo had no lease agreement with the Owners for several years. (CR 568-572, Tran, 15:25-19:21)

26. Owners have produced a lease they say Mr. Castillo was required to sign. It is dated October 5, 2012, only three and a half weeks before the attack on Amy Triana. (CR 492-494, Gonzalez, 7:15-9:23) (The lease is under Tab 2 of the Appendix.)

27. Owners say the date on the lease is the date Castillo signed it, and as suspicious as that may seem, it is evidence they had control over the dogs by the lease provisions. (CR 568, Tran, 15:13-23)

28. The lease prohibits Mr. Castillo from having dogs at 2903 Red Bluff. (CR 568, Tran, 15:13-23)

29. Had the Owners chosen to enforce the lease, Mr. Castillo would have had to remove the dogs, and consequently, the Owners maintained control over that aspect of the tenancy. (CR 568, Tran, 15:13-23)

30. The Owners thought they would not be responsible, because the lease required the tenant to carry insurance. (CR 565, Tran, 12:1-12:9)

31. When Phan and Tran were notified that Plaintiff was making a claim against them, they transferred 2903 Red Bluff to Phan-Tran Property Management, LLC. (CR 561, 564, Tran, 8:23-25; 11:10-18)

25

## SUMMARY OF THE ARGUMENT

On July 9, 2015, the Trial Court entered a judgment granting Defendants' No-Evidence Motion for Summary Judgment. The Court did not state specific grounds for granting the motion. However, the Court handwrote the following, "See *Batra v. Clark*, 110 S.W.3d, 126 (Tex. App. – Houston [1st Dist.] 2003, no pet.)". The Court simply cited a case, but from the circumstances surrounding that citation, and the act of the Court writing it, we can infer that the Court considered that case to be the controlling case.

Because that case says that for a landlord to be liable for injuries caused by dangerous dogs owned by a tenant, the landlord must have actual knowledge of the dangerous propensity of the dogs and have the ability to control the premises, not only do we know from the circumstances that the Court considered that case to be controlling, but we also know that the Court must have thought the evidence did not meet that standard. From the mere citation , we have circumstantial evidence of what was in the Court's mind.

Jurors may also use circumstantial evidence. When that circumstantial evidence could give rise to more than one reasonable inference, it is up to the jury to decide which inference to accept. Because all inferences must be found for the non-movant in a no-evidence motion for summary judgment, if an inference can be made from circumstantial evidence, the Court must find there is evidence.

In this case, the Owners/landlords of the property on which the dogs were being kept, admit they were at the premises so often that it would be impossible for them not to know the dogs were there. We know the dogs were there, because we have the deposition of the animal control officer, as well as his records, that show that the dogs were creating such a nuisance that animal control had been called out twelve times in the month and a half before the Plaintiff was attacked. There is direct evidence that the dogs were there and that the dogs were dangerous. From the landlords' concession that they had to know if the dogs were there, the jury can infer that the landlords knew that a tenant was keeping dangerous dogs on their property.

In the middle of all the calls to animal control, there is a pause for approximately a week. During that week, the landlords required their tenant to sign a lease saying the tenant could not have dogs on the property. Shortly after that, the calls to animal control commenced again. The lease gave the landlords the power to control the presence of dogs on the property, simply by enforcing the lease. The landlords did not try to control the dogs, however, thinking the lease shielded them from any duty to do so. The reasonable inference is that the Owners insisted the dogs be locked up until they thought they could hide behind the lease.

There is direct evidence that the dangerous dogs were being kept on the property, there is direct evidence that the landlords could control the presence of

the dogs on the property, and the landlords' concession they were on the property often enough they had to have known the dogs were there is circumstantial evidence of their knowledge. The elements of *Batra* are met.

This is not just a case of someone coming on the premises and being hurt by dogs being kept there. This is a case of dogs getting loose from the property and attacking someone walking along a public street. Therefore, this is a case of public nuisance. The Plaintiff has standing to bring a claim for her specific injuries caused by the public nuisance. A landlord has a common law duty to know enough about its property to prevent a public nuisance from emanating from that property. Because this is also a case of public nuisance, there is no requirement that the landlord know the dogs' presence and their dangerous propensities.

## ARGUMENT

## STANDARD FOR REVIEW

A no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *Merrill-Dow Pharmaceuticals, Inc. vs. Havner*, 953 S.W.2d 706, 711 (Tex. 1997), cert. denied, 523 U.S. 1119, 118 S. Ct. 1799, 140 L.Ed.2d 939 (1998). More than a scintilla of evidence exists when reasonable and fair-minded people could differ in their conclusions. *Havner*, 953 S.W.2d at 711. The Court must view the evidence in the light most favorable to the non-movant, disregarding all contrary evidence and inferences. *Id.* Review is *de novo*. *Gross vs. Houston Cmty. Newspapers*, 252 S.W.3d 652, 654-655 (Tex. App. – Houston [14th Dist.] 2008, no pet.).

## CIRCUMSTANTIAL EVIDENCE

A fact may be established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved. *Blount v. Bordens Inc.*, 910 S.W.2d 931, 933 (Tex. 1995 *per curiam).* If circumstantial evidence will support more than one reasonable inference, it is for the jury to decide which is more reasonable. *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001). Because the Court must resolve all inferences in favor of the Plaintiff on a review of a no-

evidence summary judgment, even if more than one reasonable inference is raised by circumstantial evidence, the no-evidence summary judgment must be denied.

I.       During a period when the Defendant Landlords concede they were on their property so often they would have known if dogs were kept there, animal control was called at least 12 times about aggressive pit bulls harassing and biting people. Animal control determined that the pit bulls were kept by a tenant on that same property. Is there circumstantial evidence that the Defendants knew dangerous dogs were being kept on their property?

The parties agree that the Owners had a duty to the Plaintiff to exercise ordinary care if they knew an animal's dangerous propensities and presence on the property, and could control the premises. *Batra v. Clark*, 110 S.W.3d 126, 130 (Tex. App. – Houston [1st Dist.] 2003, no writ).

Both Owners, Minh Phan and Misty Tran, went out of their way in their depositions to argue that they were visiting the premises at 2903 Red Bluff almost constantly during the month of October 2012. (CR 566-568, Tran, 13:11-15:12) (13:17-19, "Myself, five times a week is a little bit too much. Maybe – maybe twice, twice or three times a week;" CR 567, 14:11-12 "He's [Phan] probably out there more than I was, yeah;" CR 567, 14:16-18, [referring to the property manager] "Q. Again, as much as you? A. She's probably gone out there more and after work hours.") In addition, their property manager, Benilde Gonzalez, testified that she was going out there regularly, and visited all of their commercial properties at least twice a month. Misty Tran even testified that they were out

30

there so often, it would be impossible for Sergio Castillo to have dogs on the premises and the Owners not know it. (CR 568, Tran, 15:8-24)

According to the deposition of Officer Sublett, and the animal control records of the City of Pasadena, there is more than a scintilla of evidence that the dogs were being kept at 2903 Red Bluff by Sergio Castillo. (See the timeline in the Statement of Facts section of this brief and CR 583-670). The records show: In the month and a half before the attack on Amy Triana, animal control was called out on 12 different days. On October 18, 2012, Sergio Castillo told the animal control officer he was the owner of the dogs. When the dog escaped from a trap, it was followed back to 2903 Red Bluff. When one of the dogs harassed someone else on September 11, 2012, that person identified the dogs as coming from 2903 Red Bluff.

This evidence, with Misty Tran's admission, provides more than a scintilla of evidence that the Owners had actual knowledge of the dogs and the dangerous propensities of the dogs. At the same time that the Owners admit to constantly being on or around 2903 Red Bluff, the dogs are constantly creating a dangerous nuisance throughout the neighborhood. Reasonable minds could infer that while the Owners were there, they must have seen the dogs were getting out, roaming the neighborhood, and causing problems. Minh Phan, admits that he knows that pit bulls can be dangerous to the public. (CR 533-534, Phan, 22:23-23:5) Misty Tran

agrees that a prudent landlord would take action to get those dogs off the property.

(CR 568, Tran, 15:8-15:24)

The burden to produce some circumstantial evidence is not a heavy one. *Allen v. Albin, et al*, 97 S.W.3d 655 (Tex. App. – Waco 2002) illustrates how light that burden can be. There, suit was brought on behalf of a child injured by a dog against the owner of the dog, and the owner of a daycare provider. Referring to a conversation between the Defendants that occurred after the dog attack, the court said:

> [A] jury might infer that even though the conversation between Albin and Haferckamp occurred after the attack, Albin was conveying what she already knew about the dog's nature. A jury might infer to the contrary, though, and conclude that Albin said those things about the dog's nature only because it had hurt the toddler. But we review the summary-judgment evidence in the light most favorable to Allen, disregarding any contrary evidence or inferences.

*Id.* at 664. (citations omitted).

The court had occasion to also consider circumstantial evidence regarding the negligence of the daycare provider. Referring to the daycare owner, the court said:

> [A] jury might rely on her testimony as circumstantial evidence that because she had been aware of the fact that her neighbor kept a dog in the past, it is probable that she was aware of when her neighbor came into possession of the dog in question.

*Id.* at 670.

Here, the Defendants claim that they did not know about the dogs' existence, yet they concede that it would be impossible for them to not know the dogs' existence. Not only could the jury infer from the animal control records that anyone who saw the pit bulls would know they had dangerous propensities, but the jury could also infer from their denial of the dogs' existence, that the Defendants were motivated to deny the existence of the dogs precisely because they did know of their dangerous propensities.

The Owners claim they did not know the dogs were there, but that must be disregarded in a review of a No-evidence Motion for Summary Judgment in which all inferences must be in favor of the non-movant. Their knowledge of the dogs and the dogs' vicious nature is fairly and reasonably inferred by the Owners' continuous presence of 2903 Red Bluff and the admission they would have had to have knowledge of the dogs. *Havner*, 953 S.W.2d at 711. There is more than a scintilla of evidence, which is all that is required, that the Owners knew the dogs were being kept on their property, they knew the dangerous propensities of the dogs, and that the lease they had with Sergio Castillo gave them the authority to enforce having the dogs removed from the property. (The lease is under Tab 2 of the Appendix.) They did not exercise that control or even require the dogs to be securely confined, and that is evidence of their negligence. Misty Tran has indicated

they thought the lease requirement that the tenant carry insurance meant the

Owners would not be responsible and did not need insurance. (CR 565,

Tran, 12:1-12:9)

II.     A public nuisance exists when activities on a landlord's property are injurious to the surrounding neighborhood. Under Texas law, a landlord is responsible for a public nuisance on its property even if it is not shown to have actual knowledge of the public nuisance, and an individual who suffers a unique injury because of the public nuisance has standing to sue. Is there at least a scintilla of evidence that Defendant Landlords are liable for Plaintiff's injuries resulting from a public nuisance?

## A. PUBLIC NUISANCE (DOGS) AFFECTS THE COMMUNITY

Amy Triana, besides her cause of action for negligence, has brought a cause

of action for public nuisance. A public nuisance differs from a private nuisance. A

private nuisance occurs when someone creates a condition that interferes with

another person's use and enjoyment of real property. A public nuisance comes

about when the defendant's conduct is a significant interference with the public's

safety or health, and the conduct adversely affects all or a considerable part of the

community. *Jamail v. Stoneledge Condominium Owners* Association, 970 S.W.2d

673, 676 (Tex. App. – Austin 1998, no pet.); *Walker v. Texas Electric Service Co.*,

499 S.W.2d 20, 27 (Tex. Civ. App. – Fort Worth 1973, no writ). So if a chemical

plant dumps waste on an adjacent landowner's property, that is a private nuisance.

If a chemical company dumps waste into a river that contaminates a public beach

downstream, that is a public nuisance.  *See* Restatement (Second) Torts § 821B cmt. e (1979).

While cases talk of a public nuisance affecting the community  that is merely to differentiate from private nuisance and does not mean literally the whole entire community.  A house of prostitution – clearly a public nuisance in Texas – does not cease to be a public nuisance just because not everyone goes there.  The Ft. Worth Court of Appeals has said:

> A public nuisance exists wherever acts or conditions are subversive of public order, or constitute an obstruction of public rights.  20 R.C.L., p. 384, Sec. 7.
>
> For a nuisance to be a public one, it need not affect the whole community; but it is public if injury or annoyance affect the people of some local neighborhood, or are occasioned to such part of the public as come in contact with it.  39 Am.Jur., p. 288, Sec. 10.

*Stoughton v. City of Fort Worth*, 277 S.W.2d 150, 153 (Tex. Civ. App. – Fort Worth 1955, no writ).

A nuisance is public if it – as in this case – affects a street that pedestrians, such as Plaintiff, may walk along.  Again, the Fort Worth Court of Appeals said in an even earlier case:

> One of the cases cited by appellant under 46 C.J., p. 646, being the *State v. Rabinowitz*, 85 Kan. 841, 118 P. 1040, 1042, 39 L.R.A., N.S., 187, gives, we think, a correct definition of a public nuisance, as follows: "A nuisance is public if it affects a community at large, or if it affects a place where the public have a right to and do go, such as a park, street, or alley, and which nuisance necessarily  annoys, offends, or injures those who come within the scope of its influence."

*Soap Corp. of Am. v. Balis*, 223 S.W.2d 957, 960 (Tex. Civ. App. – Fort Worth 1949), writ refused NRE.

A private citizen has standing to bring a claim for public nuisance if they suffered an injury different from the public . *Jamail*, 970 S.W.2d at 676; *Quanah Acme & P. Ry. Co. v.* Swearingen, 45 S.W.2d 136, 139 (Tex. Civ. App. – Amarillo 1927, writ ref'd). Amy Triana qualifies, because she was specifically attacked by the dogs. While other people in the community had to protect themselves and their property by avoiding the dogs – some less successfully than others – Amy Triana was actually savagely attacked by both dogs acting as a pack. While the City of Pasadena, Texas could have sued to abate the nuisance to protect the public from the dogs, Amy Triana can sue, because she was actually injured by the nuisance.

## B. CONDUCT CREATING A PUBLIC NUISANCE

As argued above, there is more than a scintilla of evidence that the Owners knew the dogs were on the premises. There is more than a scintilla of evidence that the Owners knew of the dangerous propensities of the dogs being kept on the premises. The animal control records show there is more than a scintilla of evidence that the Owners knew that the dogs could get out from the premises. And there is more than a scintilla of evidence that the Owners could control the presence of the dogs on the premises by simply enforcing the lease. There is more

36

than a scintilla of evidence that the Owners allowed a public nuisance at 2903 Red Bluff.

A vicious dog roaming at large is a public nuisance. *Cf. City of Garland v. White*, 368 S.W.2d 12, 16 (Tex. Civ. App. – Eastland 1963), writ refused NRE. It has been the law in the State of Texas for over 130 years that an owner of property is liable for a public nuisance even if the owner did not know that a nuisance was being maintained on its property. *See Marsan v. French*, 61 Tex. 173 (1884), (A court's charge requiring knowledge by a landlord that prostitution was occurring on his property was more favorable to the landlord than "should be applied in civil cases."); see *also Moore v. State*, 107 Tex. 490, 181 S.W. 438, 439 (1915) (Approving *Marsan v. French* and stating, "The owner of premises is under a primary obligation to keep his premises from becoming a public nuisance. It is a common-law duty. Joyce on Nuisances, Section 453. It is frequently announced as a general rule that an owner is not liable for a nuisance created by his tenant of which he has no knowledge. But upon examination, it would be found that this is a doctrine applied to private nuisances. And it may be doubted whether it is to be accepted without qualification in relation to merely private nuisances."); *Dodd v. State*, 193 S.W.2d 569, 572 (Tex. Civ. App. – Texas – Dallas 1946) (The owner of a house . . . may be enjoined from maintaining a public nuisance, although he had no knowledge of the illegal use to which his premises were being devoted.") There

is more than a scintilla of evidence that a public nuisance emanated from 2903 Red Bluff. By allowing that public nuisance to continue, the Owners became liable for Triana's special injuries even if they had managed to keep themselves ignorant of what was going on.

## CONCLUSION

Appellant/Plaintiff requests the No-Evidence Summary Judgment be reversed and the case remanded for trial. Appellant/Plaintiff seeks such further relief to which she may be justly entitled.

Respectfully submitted,

KURT ARBUCKLE, P.C.

By: /S/ Kurt Arbuckle_____
  KURT ARBUCKLE
  Texas Bar No. 01284500
  Email: kurt@kurtarbuckle.com
  2121 Sage Road, Suite 100
  Houston, Texas 77056
  713 961-5353
  713 961-5236 Fax
ATTORNEY FOR APPELLANT

## CERTIFICATE OF COMPLIANCE

The number of words in this brief, according to Microsoft Word 2007 is 5,695.

/S/ Kurt Arbuckle_____
KURT ARBUCKLE

## **CERTIFICATE OF SERVICE**

As required by Texas Rule of Appellate Procedure 6.3 and 9.5(b),(d),(e), I certify I have served this document on all other parties – which are listed below – on the 16th day of December 2015:

Wolf A. McGavran
Haynes & Boone, LLP
1221 McKinney Street, Suite 2100
Houston TX 77010
Attorney for Appellee


/S/ Kurt Arbuckle_____
KURT ARBUCKLE

| Tab | | Pages |
|---|---|---|
| 1 | Order Granting Defendants' No-Evidence Motion for Summary Judgment entered on July 9, 2015 | 2 |
| 2 | Commercial Lease Agreement between Phan-Tran Property Management and Sergio Castillo dated October 5, 2012 | 6 |

NO. 01-15-00676-CV

IN THE COURT OF APPEALS
FOR THE FIRST JUDICIAL DISTRICT
HOUSTON DIVISION

AMY G. TRIANA, D/B/A IRMA K. ORTEGA,

Appellant,

v.

PHAN-TRAN PROPERTY MANAGEMENT, LLC,
MINH PHAN, MISTY TRAN, AND SERGIO CASTILLO,

Appellees.

On Appeal from the 334th Judicial District Court
Of Harris County, Texas
Trial Court Cause No. 2013-74660

**TAB 1 TO
APPENDIX OF
APPELLANT'S BRIEF**

4/20/2015 3:20:22 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 4956472
By: JIMENEZ, DANIELLE N
Filed: 4/20/2015 3:20:22 PM

CAUSE NO. 2013-74660

| | | |
|---|---|---|
| AMY G. TRIANA, B/N/F, | § | IN THE DISTRICT COURT OF |
| IRMA K. ORTEGA, | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| VS. | § | HARRIS COUNTY, TEXAS |
| | § | |
| PHAN-TRAN PROPERTY | § | |
| MANAGEMENT, LLC, MINH PHAN, | § | |
| MISTY TRAN, AND SERGIO CASTILLO, | § | |
| *Defendants.* | § | 334TH JUDICIAL DISTRICT |

## ORDER GRANTING
### DEFENDANTS PHAN TRAN-PROPERTY MANAGEMENT, LLC'S, MINH PHAN'S, AND MISTY TRAN'S NO-EVIDENCE MOTION FOR SUMMMARY JUDGMENT

On this day, the Court considered Defendants Phan-Tran Property Management, LLC's, Minh Phan's and Misty Tran's No-Evidence Motion for Summary Judgment (the "Motion").

After reviewing the Motion, responses and replies thereto, summary judgment evidence, and hearing argument from counsel, if any, the Court finds that the Motion should be GRANTED. *See Betha v. Clark, 110 S.W.3d 126 (Tex. App - Houston [1st Dist.] 2003, no pet.).* IT IS THEREFORE ORDERED THAT the Motion is hereby granted.

IT IS FURTHER ORDERED THAT Plaintiff Amy G. Triana, B/N/F Irma K. Ortega, TAKE NOTHING by way of her claims against Defendants Phan-Tran Property Management, LLC, Minh Phan, and Misty Tran.

IT IS THEREFORE FURTHER ORDERED THAT the claims of Plaintiff Amy G. Triana, B/N/F Irma K. Ortega, against Defendants Phan-Tran Property Management, LLC, Minh Phan, and Misty Tran are hereby dismissed in their entirety with prejudice.

SO ORDERED on this 9th day of __July__, 2015.

_____
JUDGE PRESIDING

NO. 01-15-00676-CV

IN THE COURT OF APPEALS
FOR THE FIRST JUDICIAL DISTRICT
HOUSTON DIVISION

AMY G. TRIANA, D/B/A IRMA K. ORTEGA,

Appellant,

v.

PHAN-TRAN PROPERTY MANAGEMENT, LLC,
MINH PHAN, MISTY TRAN, AND SERGIO CASTILLO,

Appellees.

On Appeal from the 334th Judicial District Court
Of Harris County, Texas
Trial Court Cause No. 2013-74660

**TAB 2 TO
APPENDIX OF
APPELLANT'S BRIEF**

## COMMERCIAL LEASE AGREEMENT

This Commercial Lease Agreement ("Lease") is made and effective **October 05, 2012** [Date], by and between **PHAN-TRAN PROPERTY MANGEMENT** [Landlord] ("Landlord") and **SERGIO CASTILLO** [Tenant] ("Tenant").

Landlord is the owner of land and improvements commonly known and numbered as **2903 RED BLUFF PASADENA, TX. 77502** [Address of Building] and legally described as follows (the "Building"):

_____ [Legal Description of Building]

Landlord makes available for lease a portion of the Building designated as N/A or Other Number of Leased Building] (the "Leased Premises").

Landlord desires to lease the Leased Premises to Tenant, and Tenant desires to lease the Leased Premises from Landlord for the term, at the rental and upon the covenants, conditions and provisions herein set forth.

THEREFORE, in consideration of the mutual promises herein, contained and other good and valuable consideration, it is agreed:

### 1. Term.

A. Landlord hereby leases the Leased Premises to Tenant, and Tenant hereby leases the same from Landlord, for an "Initial Term" beginning **10/05/2012** [Start Date] and ending **10/31/2017** [End Date]. Landlord shall use its best efforts to give Tenant possession as nearly as possible at the beginning of the Lease term. If Landlord is unable to timely provide the Leased Premises, rent shall abate for the period of delay. Tenant shall make no other claim against Landlord for any such delay.

B. Tenant may renew the Lease for one extended term of (will discuss 30 days prior to end date) [Renewal Term]. Tenant shall exercise such renewal option, if at all; by giving written notice to Landlord not less than ninety (90) days prior to the expiration of the Initial Term. The renewal term shall be at the rental set forth below and otherwise upon the same covenants, conditions and provisions as provided in this Lease.

### 2. Rental.

A. Tenant shall pay to Landlord during the Initial Term rental of $7200.00 [Annual Rent] per year, payable in installments of $600.00 [Monthly Rental Amount] per month. Each installment payment shall be due in advance on the first day of each calendar month during the lease term to Landlord at **123 W. Southmore Ave Pasadena, TX. 77502** [Landlord's Designated Payment Address] or at such other place designated by written notice from Landlord or Tenant. The rental payment amount for any partial calendar months included in the lease term shall be prorated on a daily basis. Tenant shall also pay to Landlord a "Security Deposit" in the amount of $600.00 [Security Deposit].

B. The rental for any renewal lease term, if created as permitted under this Lease, shall be **NOT AVAILABLE AT THIS MOMENT** [Annual Rent in Renewal Term] per year payable in installments of **NOT AVAILABLE AT THIS MOMENT** [Monthly Rental Amount] per month.

### 3. Use

Notwithstanding the forgoing, Tenant shall not use the Leased Premises for the purposes of storing, manufacturing or selling any explosives, flammables or other inherently dangerous substance, chemical, thing or device.

### 4. Sublease and Assignment.

Tenant shall have the right without Landlord's consent, to assign this Lease to a corporation with which Tenant may merge or consolidate, to any subsidiary of Tenant, to any corporation under common control with Tenant, or to a purchaser of substantially all of Tenant's assets. Except as set forth above, Tenant shall not sublease all or any part of the Leased Premises, or assign this Lease in whole or in part without Landlord's consent, such consent not to be unreasonably withheld or delayed.

### 5. Repairs.

During the Lease term, Tenant shall make, at Tenant's expense, all necessary repairs to the Leased Premises. Repairs shall include such items as routine repairs of floors, walls, ceilings, and other parts of the Leased Premises damaged or worn through normal occupancy, except for major mechanical systems or the roof, subject to the obligations of the parties otherwise set forth in this Lease.

### 6. Alterations and Improvements.

Tenant, at Tenant's expense, shall have the right following Landlord's consent to remodel, redecorate, and make additions, improvements and replacements of and to all or any part of the Leased Premises from time to time as Tenant may deem desirable, provided the same are made in a workmanlike manner and utilizing good quality materials. Tenant shall have the right to place and install personal property, trade fixtures, equipment and other temporary installations in and upon the Leased Premises, and fasten the same to the premises. All personal property, equipment, machinery, trade fixtures and temporary installations, whether acquired by Tenant at the commencement of the Lease term or placed or installed on the Leased Premises by Tenant thereafter, shall remain Tenant's property free and clear of any claim by Landlord. Tenant shall have the right to remove the same at any time during the term of this Lease provided that all damage to the Leased Premises caused by such removal shall be repaired by Tenant at Tenant's expense.

### 7. Property Taxes.

Landlord shall pay, prior to delinquency, all general real estate taxes and installments of special assessments coming due during the Lease term on the Leased Premises, and all personal property taxes with respect to Landlord's personal property, if any, on the Leased Premises. Tenant shall be responsible for paying all personal property taxes with respect to Tenant's personal property at the Leased Premises.

### 8. Insurance.

A. If the Leased Premises or any other party of the Building is damaged by fire or other casualty resulting from any act or negligence of Tenant or any of Tenant's agents, employees or invitees, rent shall not be diminished or abated while such damages are under repair, and Tenant shall be responsible for the costs of repair not covered by insurance.

B. Landlord shall maintain fire and extended coverage insurance on the Building and the Leased Premises in such amounts as Landlord shall deem appropriate. Tenant shall be responsible, at its expense, for fire and extended coverage insurance on all of its personal property, including removable trade fixtures, located in the Leased Premises.

C. Tenant and Landlord shall, each at its own expense, maintain a policy or policies of comprehensive general liability insurance with respect to the respective activities of each in the Building with the premiums thereon fully paid on or before due date, issued by and binding upon some insurance company approved by Landlord, such insurance to afford minimum protection of not less than $1,000,000 combined single limit coverage of bodily injury, property damage or combination thereof. Landlord shall be listed as an additional insured on Tenant's policy or policies of comprehensive general liability insurance, and Tenant shall provide Landlord with current Certificates of Insurance evidencing Tenant's compliance with this Paragraph. Tenant shall obtain the agreement of Tenant's insurers to notify Landlord that a policy is due to expire at least (10) days prior to such expiration. Landlord shall not be required to maintain insurance against thefts within the Leased Premises or the Building.

### 9. Utilities.

Tenant shall pay all charges for water, sewer, gas, electricity, telephone and other services and utilities used by Tenant on the Leased Premises during the term of this Lease unless otherwise expressly agreed in writing by Landlord. In the event that any utility or service provided to the Leased Premises is not separately metered, Landlord shall pay the amount due and separately invoice Tenant for Tenant's pro rata share of the charges. Tenant shall pay such amounts within fifteen (15) days of invoice. Tenant acknowledges that the Leased Premises are designed to provide standard office use electrical facilities and standard office lighting. Tenant shall not use any equipment or devices that utilize excessive electrical energy or which may, in Landlord's reasonable opinion, overload the wiring or interfere with electrical services to other tenants.

### 10. Signs.

Following Landlord's consent, Tenant shall have the right to place on the Leased Premises, at locations selected by Tenant, any signs which are permitted by applicable zoning ordinances and private restrictions. Landlord may ref use consent to any proposed signage that is in Landlord's opinion too large, deceptive, unattractive or otherwise inconsistent with or inappropriate to the Leased Premises or use of any other tenant. Landlord shall assist and cooperate with Tenant in obtaining any necessary permission from governmental authorities or adjoining owners and occupants for Tenant to place or construct the foregoing signs. Tenant shall repair all damage to the Leased Premises resulting from the removal of signs installed by Tenant.

### 11. Entry.

Landlord shall have the right to enter upon the Leased Premises at reasonable hours to inspect the same, provided Landlord shall not thereby unreasonably interfere with Tenant's business on the Leased Premises.

### 12. Parking.

During the term of this Lease, Tenant shall have the non-exclusive use in common with Landlord, other tenants of the Building, their guests and invitees, of the non-reserved common automobile parking areas, driveways, and footway s, subject to rules and regulations for the use thereof as prescribed from time to time by Landlord. Landlord reserves the right to designate parking areas within the Building or in reasonable proximity thereto, for Tenant and Tenant's agents and employees. Tenant shall provide Landlord with a list of all license numbers for the cars owned by Tenant, its agents and employees. Separated structured parking, if any, located about the Building is reserved for tenants of the Building who rent such parking spaces. Tenant hereby leases from Landlord N/A [Number of Parking Spaces] spaces in such structural parking area, such spaces to be on a first come-first served basis. In consideration of the leasing to Tenant of such spaces, Tenant shall pay a monthly rental of N/A [Parking Space Rental] per space throughout the term of the Lease. Such rental shall be due and payable each month without demand at the time herein set for the payment of other monthly rentals, in addition to such other rentals.

### 13. Building Rules.

Tenant will comply with the rules of the Building adopted and altered by Landlord from time to time and will cause all of its agents, employees, invitees and visitors to do so; all changes to such rules will be sent by Landlord to Tenant in writing. The initial rules for the Building are attached hereto as Exhibit "A" and incorporated herein for all purposes. **Tenant does not have permission to have pets within the leasing space indoor or outdoor. This applies to guard dogs or any type of animal which may hold harm to clients, guests or visitors when coming and leaving of the leased premise. If tenant does not comply by this rule and retain an animal without owner's knowledge- owner is held harmless to all legal issues which may arise due to tenant non compliance of rules.**

### 14. Damage and Destruction.

Subject to Section 8 A. above, if the Leased Premises or any part thereof or any appurtenance thereto is so damaged by fire, casualty or structural defects that the same cannot be used for Tenant's purposes, then

Tenant shall have the right within ninety (90) days following damage to elect by notice to Landlord to terminate this Lease as of the date of such damage. In the event of minor damage to any part of the Leased Premises, and if such damage does not render the Leased Premises unusable for Tenant's purposes, Landlord shall promptly repair such damage at the cost of the Landlord. In making the repairs called for in this paragraph, Landlord shall not be liable for any delays resulting from strikes, governmental restrictions, inability to obtain necessary materials or labor or other matters which are beyond the reasonable control of Landlord. Tenant shall be relieved from paying rent and other charges during any portion of the Lease term that the Leased Premises are inoperable or unfit for occupancy, or use, in whole or in part, for Tenant's purposes. Rentals and other charges paid in advance for any such periods shall be credited on the next ensuing payments, if any, but if no further payments are to be made, any such advance payments shall be refunded to Tenant. The provisions of this paragraph extend not only to the matters aforesaid, but also to any occurrence which is beyond Tenant's reasonable control and which renders the Leased Premises, or any appurtenance thereto, inoperable or unfit for occupancy or use, in whole or in part, for Tenant's purposes.

## 15. Default.

If default shall at any time be made by Tenant in the payment of rent when due to Landlord as herein provided, and if said default shall continue for fifteen (15) days after written notice thereof shall have been given to Tenant by Landlord, or if default shall be made in any of the other covenants or conditions to be kept, observed and performed by Tenant, and such default shall continue for thirty (30) days after notice thereof in writing to Tenant by Landlord without correction thereof then having been commenced and thereafter diligently prosecuted, Landlord may declare the term of this Lease ended and terminated by giving Tenant written notice of such intention, and if possession of the Leased Premises is not surrendered, Landlord may reenter said premises. Landlord shall have, in addition to the remedy above provided, any other right or remedy available to Landlord on account of any Tenant default, either in law or equity. Landlord shall use reasonable efforts to mitigate its damages.

## 16. Quiet Possession.

Landlord covenants and warrants that upon performance by Tenant of its obligations hereunder, Landlord will keep and maintain Tenant in exclusive, quiet, peaceable and undisturbed and uninterrupted possession of the Leased Premises during the term of this Lease.

## 17. Condemnation.

If any legally, constituted authority condemns the Building or such part thereof which shall make the Leased Premises unsuitable for leasing, this Lease shall cease when the public authority takes possession, and Landlord and Tenant shall account for rental as of that date. Such termination shall be without prejudice to the rights of either party to recover compensation from the condemning authority for any loss or damage caused by the condemnation. Neither party shall have any rights in or to any award made to the other by the condemning authority.

## 18. Subordination.

Tenant accepts this Lease subject and subordinate to any mortgage, deed of trust or other lien presently existing or hereafter arising upon the Leased Premises, or upon the Building and to any renewals, refinancing and extensions thereof, but Tenant agrees that any such mortgagee shall have the right at any time to subordinate such mortgage, deed of trust or other lien to this Lease on such terms and subject to such conditions as such mortgagee may deem appropriate in its discretion. Landlord is hereby irrevocably vested with full power and authority to subordinate this Lease to any mortgage, deed of trust or other lien now existing or hereafter placed upon the Leased Premises of the Building, and Tenant agrees upon demand to execute such further instruments subordinating this Lease or attorning to the holder of any such liens as Landlord may request. In the event that Tenant should fail to execute any instrument of subordination herein require d to be executed by Tenant promptly as requested, Tenant hereby irrevocably constitutes Landlord as its attorney-in-fact to execute such instrument in Tenant's name, place and stead, it being agreed that such power is one coupled with an interest. Tenant agrees that it will from time to time upon request by Landlord execute and deliver to such persons as Landlord shall request a statement in recordable form certifying that this Lease is

unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified), stating the dates to which rent and other charges payable under this Lease have been paid, stating that Landlord is not in default hereunder (or if Tenant alleges a default stating the nature of such alleged default) and further stating such other matters as Landlord shall reasonably require.

**19. Security Deposit.**

The Security Deposit shall be held by Landlord without liability for interest and as security for the performance by Tenant of Tenant's covenants and obligations under this Lease, it being expressly understood that the Security Deposit shall not be considered an advance payment of rental or a measure of Landlord's damages in case of default by Tenant. Unless otherwise provided by mandatory non-waivable law or regulation, Landlord may commingle the Security Deposit with Landlord's other funds. Landlord may, from time to time, without prejudice to any other remedy, use the Security Deposit to the extent necessary to make good any arrearages of rent or to satisfy any other covenant or obligation of Tenant hereunder. Following any such application of the Security Deposit, Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount. If Tenant is not in default at the termination of this Lease, the balance of the Security Deposit remaining after any such application shall be returned by Landlord to Tenant. If Landlord transfers its interest in the Premises during the term of this Lease, Landlord may assign the Security Deposit to the transferee and thereafter shall have no further liability for the return of such Security Deposit.

**20. Notice.**

Any notice required or permitted under this Lease shall be deemed sufficiently given or served if sent by United States certified mail, return receipt requested, addressed as follows:

*If to Landlord to:*

**PHAN-TRAN PROPERTY MANAGEMENT**
[Landlord]
123 W. Southmore Ave
Pasadena, TX. 77502
[Landlord's Address]

*If to Tenant to:*

**Sergio Castillo**
[Tenant]
2903 Red Bluff
Pasadena, TX. 77506
[Tenant's Address]

Landlord and Tenant shall each have the right from time to time to change the place notice is to be given under this paragraph by written notice thereof to the other party.

**21. Brokers.**

Tenant represents that Tenant was not shown the Premises by any real estate broker or agent and that Tenant has not otherwise engaged in, any activity which could form the basis for a claim for real estate commission, brokerage fee, finder's fee or other similar charge, in connection with this Lease.

**22. Waiver.**

No waiver of any default of Landlord or Tenant hereunder shall be implied from any omission to take any action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default specified in the express waiver and that only for the time and to the extent therein stated. One or more waivers by Landlord or Tenant shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition.

**23. Memorandum of Lease.**

The parties hereto contemplate that this Lease should not and shall not be filed for record, but in lieu thereof, at the request of either party, Landlord and Tenant shall execute a Memorandum of Lease to be recorded for the purpose of giving record notice of the appropriate provisions of this Lease.

**24. Headings.**

The headings used in this Lease are for convenience of the parties only and shall not be considered in interpreting the meaning of any provision of this Lease.

### 25. Successors.

The provisions of this Lease shall extend to and be binding upon Landlord and Tenant and their respective legal representatives, successors and assigns.

### 26. Consent.

Landlord shall not unreasonably withhold or delay its consent with respect to any matter for which Landlord's consent is required or desirable under this Lease.

### 27. Performance.

If there is a default with respect to any of Landlord's covenants, warranties or representations under this Lease, and if the default continues more than fifteen (15) days after notice in writing from Tenant to Landlord specifying the default, Tenant may, at its option and without affecting any other remedy hereunder, cure such default and deduct the cost thereof from the next accruing installment or installments of rent payable hereunder until Tenant shall have been fully reimbursed for such expenditures, together with interest thereon at a rate equal to the lesser of twelve percent (12%) per annum or the then highest lawful rate. If this Lease terminates prior to Tenant's receiving full reimbursement, Landlord shall pay the unreimbursed balance plus accrued interest to Tenant on demand.

### 28. Compliance with Law.

Tenant shall comply with all laws, orders, ordinances and other public requirements now or hereafter pertaining to Tenant's use of the Leased Premises. Landlord shall comply with all laws, orders, ordinances and other public requirements now or hereafter affecting the Leased Premises.

### 29. Final Agreement.

This Agreement terminates and supersedes all prior understandings or agreements on the subject matter hereof. This Agreement may be modified only by a further writing that is duly executed by both parties.

### 30. Governing Law.

This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of Texas.

IN WITNESS WHEREOF, the parties have executed this Lease as of the day and year first above written.



_____
[Land Lord Signature]



_____
[Tenant Signature]